# Exhibit 2





No Items in Cart  **LOGIN**

Civil Docket Report

A $5 Convenience fee will be added to the transaction at checkout.

## Case Description

| | |
|---|---|
| **Case ID:** | 230702187 |
| **Case Caption:** | STOBBA ASSOCIATES, L.P. VS GIANT FOOD STORES, LLC |
| **Filing Date:** | Friday , July 21st, 2023 |
| **Court:** | COMMERCE - STANDARD, JURY |
| **Location:** | CITY HALL |
| **Jury:** | JURY |
| **Case Type:** | CONTRACTS OTHER |
| **Status:** | WAITING TO LIST CASE MGMT CONF |

## Related Cases

*No related cases were found.*

## Case Event Schedule

*No case events were found.*

## Case motions

*No case motions were found.*

## Case Parties

| Seq # | Assoc | Expn Date | Type | Name |
|---|---|---|---|---|
| 1 | | | ATTORNEY FOR PLAINTIFF | GARBER, BENJAMIN A |
| **Address:** | BRAVERMAN KASKEY PC 1650 MARKET STREET 56TH FLOOR PHILADELPHIA PA 19103 (215)575-3800 bgarber@braverlaw.com | **Aliases:** | *none* | |
| | | | | |
| 2 | 1 | | PLAINTIFF | STOBBA ASSOCIATES LP |
| **Address:** | 530 S. 2ND STREET STE. 110 PHILADELPHIA PA 19147 | **Aliases:** | *none* | |
| | | | | |

| 3 | | | DEFENDANT | GIANT FOOD STORES LLC |
|---|---|---|---|---|
| **Address:** | 1149 HARRISBURG PIKE CARLISLE PA 17013 | **Aliases:** | GIANT COMPANY LLC | |
| | | | | |
| 4 | | | DEFENDANT | AHOLD USA INC |
| **Address:** | 1149 HARRISBURG PIKE CARLISLE PA 17013 | **Aliases:** | *none* | |
| | | | | |
| 5 | | | DEFENDANT | ROBINSON, TODD |
| **Address:** | 1149 HARRISBURG PIKE CARLISLE PA 17013 | **Aliases:** | *none* | |
| | | | | |
| 6 | | | DEFENDANT | MARKLE, BRADLEY |
| **Address:** | 1149 HARRISBURG PIKE CARLISLE PA 17013 | **Aliases:** | *none* | |
| | | | | |
| 7 | | | TEAM LEADER | PADILLA, NINA W |
| **Address:** | 360 CITY HALL PHILADELPHIA PA 19107 | **Aliases:** | *none* | |

## Docket Entries

| Filing Date/Time | Docket Type | Filing Party | Disposition Amount |
|---|---|---|---|
| 21-JUL-2023 04:35 PM | ACTIVE CASE | | |
| **Docket Entry:** | E-Filing Number: 2307043338 | | |
| | | | |
| 21-JUL-2023 04:35 PM | COMMENCEMENT CIVIL ACTION JURY | GARBER, BENJAMIN A | |
| **Documents:** | 🅰 Click link(s) to preview/purchase the documents <br> Final Cover | 🛒 **Click HERE to purchase all documents** related to this one docket entry | |
| **Docket Entry:** | *none.* | | |
| | | | |

| 21-JUL-2023<br>04:35 PM | COMPLAINT FILED NOTICE GIVEN | GARBER, BENJAMIN A | |
|---|---|---|---|
| **Documents:** | ⚑ Click link(s) to preview/purchase the documents<br>Notice to Defend.pdf<br>complaint_final_072123.pdf<br>Exhibit 1.pdf<br>Exhibit 2.pdf<br>Exhibit 3.pdf<br>Exhibit 4.pdf<br>Commerce Addendum | 🛒 Click HERE to purchase all documents related to this one docket entry | |
| **Docket Entry:** | COMPLAINT WITH NOTICE TO DEFEND WITHIN TWENTY (20) DAYS AFTER SERVICE IN ACCORDANCE WITH RULE 1018.1 FILED. | | |
| | | | |
| 21-JUL-2023<br>04:35 PM | JURY TRIAL PERFECTED | GARBER, BENJAMIN A | |
| **Docket Entry:** | 12 JURORS REQUESTED. | | |
| | | | |
| 21-JUL-2023<br>04:35 PM | WAITING TO LIST CASE MGMT CONF | GARBER, BENJAMIN A | |
| **Docket Entry:** | *none.* | | |
| | | | |
| 27-JUL-2023<br>03:33 PM | AFFIDAVIT OF SERVICE FILED | GARBER, BENJAMIN A | |
| **Documents:** | ⚑ Click link(s) to preview/purchase the documents<br>Affidavit of Service (Giant Food) 072723.pdf<br>Exh. A (Fedex Airbill) (Giant).pdf<br>Exh. B (Fedex Proof of Delivery) (Giant).pdf | 🛒 Click HERE to purchase all documents related to this one docket entry | |
| **Docket Entry:** | AFFIDAVIT OF SERVICE OF PLAINTIFF'S COMPLAINT UPON GIANT FOOD STORES LLC BY CERTIFIED MAIL ON 07/25/2023 FILED. (FILED ON BEHALF OF STOBBA ASSOCIATES LP) | | |
| | | | |
| 27-JUL-2023<br>03:36 PM | AFFIDAVIT OF SERVICE FILED | GARBER, BENJAMIN A | |
| **Documents:** | ⚑ Click link(s) to preview/purchase the documents<br>Affidavit of Service (Ahold U.S.A. Inc.) 072723.pdf<br>Exh. A (Fedex Airbill) (Ahold USA Inc.).pdf<br>Exh. B (Fedex Proof of Delivery) (Ahold USA Inc.).pdf | 🛒 Click HERE to purchase all documents related to this one docket entry | |
| **Docket Entry:** | AFFIDAVIT OF SERVICE OF PLAINTIFF'S COMPLAINT UPON AHOLD USA INC BY CERTIFIED MAIL ON 07/25/2023 FILED. (FILED ON BEHALF OF STOBBA ASSOCIATES LP) | | |
| | | | |

| 09-AUG-2023 10:19 AM | ACCEPTANCE OF SERVICE FILED | GARBER, BENJAMIN A | |
|---|---|---|---|
| **Documents:** | ⬥ Click link(s) to preview/purchase the documents<br>Acceptance of Service Form (Todd Robinson)-c.pdf | 🛒 **Click HERE to purchase all documents related to this one docket entry** | |
| **Docket Entry:** | SERVICE OF PLAINTIFF'S COMPLAINT ACCEPTED BY TODD ROBINSON ON 08/08/2023 FILED. (FILED ON BEHALF OF STOBBA ASSOCIATES LP) | | |
| | | | |
| 09-AUG-2023 10:22 AM | ACCEPTANCE OF SERVICE FILED | GARBER, BENJAMIN A | |
| **Documents:** | ⬥ Click link(s) to preview/purchase the documents<br>Acceptance of Service Form (Bradley Markle)-c.pdf | 🛒 **Click HERE to purchase all documents related to this one docket entry** | |
| **Docket Entry:** | SERVICE OF PLAINTIFF'S COMPLAINT ACCEPTED BY BRADLEY MARKLE ON 08/08/2023 FILED. (FILED ON BEHALF OF STOBBA ASSOCIATES LP) | | |

▶ Case Description    ▶ Related Cases    ▶ Event Schedule    ▶ Case Parties    ▶ Docket Entries

Search Home

Court of Common Pleas of Philadelphia County
Trial Division

# Civil Cover Sheet

For Prothonotary Use Only (Docket Number)

**JULY 2023**

E-Filing Number: 2307043338

**02187**

| | |
|---|---|
| PLAINTIFF'S NAME<br>STOBBA ASSOCIATES, L.P. | DEFENDANT'S NAME<br>GIANT FOOD STORES, LLC, ALIAS: THE GIANT COMPANY LLC |
| PLAINTIFF'S ADDRESS<br>530 S. 2ND STREET STE. 110<br>PHILADELPHIA PA 19147 | DEFENDANT'S ADDRESS<br>1149 HARRISBURG PIKE<br>CARLISLE PA 17013 |
| PLAINTIFF'S NAME | DEFENDANT'S NAME<br>AHOLD U.S.A., INC. |
| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS<br>1149 HARRISBURG PIKE<br>CARLISLE PA 17013 |
| PLAINTIFF'S NAME | DEFENDANT'S NAME<br>TODD ROBINSON |
| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS<br>1149 HARRISBURG PIKE<br>CARLISLE PA 17013 |

| TOTAL NUMBER OF PLAINTIFFS | TOTAL NUMBER OF DEFENDANTS | COMMENCEMENT OF ACTION | | |
|---|---|---|---|---|
| 1 | 4 | ☒ Complaint<br>☐ Writ of Summons | ☐ Petition Action<br>☐ Transfer From Other Jurisdictions | ☐ Notice of Appeal |

| AMOUNT IN CONTROVERSY | COURT PROGRAMS | | | |
|---|---|---|---|---|
| ☐ $50,000.00 or less<br>☒ More than $50,000.00 | ☐ Arbitration<br>☐ Jury<br>☐ Non-Jury<br>☐ Other: | ☐ Mass Tort<br>☐ Savings Action<br>☐ Petition | ☒ Commerce<br>☐ Minor Court Appeal<br>☐ Statutory Appeals | ☐ Settlement<br>☐ Minors<br>☐ W/D/Survival |

CASE TYPE AND CODE

1O - CONTRACTS OTHER

STATUTORY BASIS FOR CAUSE OF ACTION

| RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER) | **FILED PRO PROTHY**<br>JUL **21** 2023<br>**S. RICE** | IS CASE SUBJECT TO COORDINATION ORDER?<br>YES          NO |
|---|---|---|

**TO THE PROTHONOTARY:**

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant: <u>STOBBA ASSOCIATES, L.P.</u>

Papers may be served at the address set forth below.

| NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY<br>BENJAMIN A. GARBER | ADDRESS<br>BRAVERMAN KASKEY PC<br>1650 MARKET STREET<br>56TH FLOOR<br>PHILADELPHIA PA 19103 |
|---|---|
| PHONE NUMBER<br>(215)575-3800     FAX NUMBER<br>(215)575-3800 | |
| SUPREME COURT IDENTIFICATION NO.<br>306765 | E-MAIL ADDRESS<br>bgarber@braverlaw.com |
| SIGNATURE OF FILING ATTORNEY OR PARTY<br>*BENJAMIN GARBER* | DATE SUBMITTED<br>Friday, July 21, 2023, 04:35 pm |

FINAL COPY (Approved by the Prothonotary Clerk)

**COMPLETE LIST OF DEFENDANTS:**

```
1. GIANT FOOD STORES, LLC
     ALIAS: THE GIANT COMPANY LLC
     1149 HARRISBURG PIKE
     CARLISLE PA 17013
2. AHOLD U.S.A., INC.
     1149 HARRISBURG PIKE
     CARLISLE PA 17013
3. TODD ROBINSON
     1149 HARRISBURG PIKE
     CARLISLE PA 17013
4. BRADLEY MARKLE
     1149 HARRISBURG PIKE
     CARLISLE PA 17013
```

**BRAVERMAN KASKEY GARBER PC**
BENJAMIN A. GARBER, ESQUIRE (No. 306765)
One Liberty Place, 56th Floor
1650 Market Street
Philadelphia, PA 19103
(215) 575-3800 (Telephone)
(215) 575-3801 (Facsimile)
bgarber@braverlaw.com



*Filed and Attested by the Office of Judicial Records 21 JUL 2023 04:35 pm S. RICE*

*Attorneys for Plaintiff*

| | | |
|---|---|---|
| **STOBBA ASSOCIATES, L.P.** | : | PHILADELPHIA COUNTY |
| 530 S. 2nd Street, Ste. 110 | : | COURT OF COMMON PLEAS, PA |
| Philadelphia, PA 19147 | : | CIVIL ACTION |
| *Plaintiffs,* | : | |
| | : | CASE NO. |
| v. | : | |
| | : | TERM, 2023 |
| **GIANT FOOD STORES, LLC** | : | |
| **n/k/a THE GIANT COMPANY LLC** | : | JURY TRIAL DEMANDED |
| 1149 Harrisburg Pike | : | |
| Carlisle, PA 17013 | : | COMMERCE PROGRAM |
| and | : | |
| **AHOLD U.S.A., INC.** | : | |
| 1149 Harrisburg Pike | : | |
| Carlisle, PA 17013 | : | |
| and | : | |
| **TODD ROBINSON** | : | |
| 1149 Harrisburg Pike | : | |
| Carlisle, PA 17013 | : | |
| and | : | |
| **BRADLEY MARKLE** | : | |
| 1149 Harrisburg Pike | : | |
| Carlisle, PA 17013 | : | |
| *Defendants.* | : | |
| | : | |

## NOTICE - VERIFIED COMPLAINT

Case ID: 230702187

| NOTICE | AVISO |
|---|---|
| You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after the complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you. | Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las páginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificación. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomará medidas y puede continuar la demanda en contra suya sin previo aviso o notificación. Además, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted. |
| YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER. | LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL. |
| IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE. | ASOCIACIÓN DE LICENCIADOS DE FILADELFIA<br>Servicio De Referencia E Información Legal<br>One Reading Center<br>Filadelfia, Pennsylvania 19107<br>Telefono: (215) 238-1701 |
| PHILADELPHIA BAR ASSOCIATION<br>Lawyer Referral and Information Service<br>One Reading Center<br>Philadelphia, Pennsylvania 19107<br>Telephone: (215) 238-1701 | |

2

Case ID: 230702187

**BRAVERMAN KASKEY GARBER PC**
BENJAMIN A. GARBER, ESQUIRE (No. 306765)
One Liberty Place, 56th Floor
1650 Market Street
Philadelphia, PA 19103
(215) 575-3800 (Telephone)
(215) 575-3801 (Facsimile)
bgarber@braverlaw.com


*Filed and Attested by the*
*Office of Judicial Records*
*21 JUL 2023 04:35 pm*
*S. RICE*

*Attorneys for Plaintiff*

| | | |
|---|---|---|
| **STOBBA ASSOCIATES, L.P.** | : | PHILADELPHIA COUNTY |
| 530 S. 2nd Street, Ste. 110 | : | COURT OF COMMON PLEAS, PA |
| Philadelphia, PA 19147 | : | CIVIL ACTION |
| *Plaintiffs,* | : | |
| | : | CASE NO. |
| v. | : | |
| | : | TERM, 2023 |
| **GIANT FOOD STORES, LLC** | : | |
| **n/k/a THE GIANT COMPANY LLC** | : | JURY TRIAL DEMANDED |
| 1149 Harrisburg Pike | : | |
| Carlisle, PA 17013 | : | COMMERCE PROGRAM |
| and | : | |
| **AHOLD U.S.A., INC.** | : | |
| 1149 Harrisburg Pike | : | |
| Carlisle, PA 17013 | : | |
| and | : | |
| **TODD ROBINSON** | : | |
| 1149 Harrisburg Pike | : | |
| Carlisle, PA 17013 | : | |
| and | : | |
| **BRADLEY MARKLE** | : | |
| 1149 Harrisburg Pike | : | |
| Carlisle, PA 17013 | : | |
| *Defendants.* | : | |
| | : | |

## <u>VERIFIED COMPLAINT</u>

Plaintiff Stobba Associates, L.P., through its undersigned counsel, brings this Complaint

against defendants Giant Food Stores, LLC, n/k/a, the GIANT Company LLC ("Giant"), Ahold

U.S.A., Inc., Todd Robinson, and Bradley Markle, as follows:

Case ID: 230702187

## PRELIMINARY STATEMENT

1.      This is an action by plaintiff to recover tens of millions of dollars in losses, as well as damage to plaintiff's reputation, caused by defendants' unlawful conduct, including breaches of contract and fraud which has only recently come to light.

2.      Giant and its affiliates and agents, including defendants Todd Robinson and Bradley Markle, have perpetrated a diabolic scheme of misrepresentations and deception designed to keep the primary retail space at the Abbotts Square building in Philadelphia "off market" and "dark".  By doing so, defendants have successfully, for nearly three years, blocked any of its competitors from leasing the space and protected the other grocery stores it opened in the City of Philadelphia during the same time from being cannibalized by a grocery store at Abbotts Square.

3.      In perpetrating fraud against plaintiff, Giant has also refused to pay plaintiff rent in violation of its lease, manufacturing a dispute over its electrical service to avoid paying millions in rent due and owing and to provide cover for its scheme.

4.      Ahold U.S.A., Inc. irrevocably and unconditionally guaranteed Giant's financial obligations under the Lease, including the payment of rent, and is joined herein pursuant to its guaranty made in favor of the plaintiff.

5.      Defendants' unlawful conduct has harmed not only the plaintiff, but the City of Philadelphia, the South Street/Queen Village neighborhood, the South Street Headhouse District, and the residents of neighboring Society Hill.

6.      As a result of the defendants' unlawful conduct, plaintiff asserts the claims set forth herein.

Case ID: 230702187

**THE PARTIES**

7.     Plaintiff Stobba Associates, L.P. ("plaintiff") is a Pennsylvania limited partnership with the above-captioned addresses who holds certain ownership interests in a Philadelphia mixed-used property known as "Abbotts Square."

8.     Defendant Giant is a Delaware limited liability company having an address at 1149 Harrisburg Pike, Carlisle, PA 17013.

9.     Ahold U.S.A., Inc. is a Maryland corporation having an address at 1149 Harrisburg Pike, Carlisle, PA 17013.

10.     Defendant Todd Robinson ("Robinson") is an adult individual residing and domiciled in the Commonwealth of Pennsylvania having an address of 1149 Harrisburg Pike, Carlisle, PA 17013.

11.     Robinson is Giant's Director of Real Estate.

12.     Defendant Bradley Markle ("Markle") is an adult individual residing and domiciled in the Commonwealth of Pennsylvania having an address of 1149 Harrisburg Pike, Carlisle, PA 17013.

13.     Markle is Giant's Manger of Real Estate.

14.     Defendants Robinson and Markle operate out of Giant's headquarters at 1149 Harrisburg Pike, Carlisle, PA 17013.

15.     At all times material hereto, the individual defendants have directly or indirectly, directed, and/or controlled the activities of Giant.

**JURISDICTION AND VENUE**

16.     This Court has subject matter jurisdiction over this action pursuant to 42 Pa.C.S. § 931.

Case ID: 230702187

17.     Pursuant to 42 Pa.C.S. § 5301, this Court has personal jurisdiction over all of the parties.

18.     Venue is appropriate in Philadelphia County pursuant to Pa.R.C.P. Nos. 1006(a)(1) and 2179(a)(2)(3)(4) and (5).

## **FACTS**

19.     Plaintiff's principal, Eric Blumenfeld, is a Philadelphia real estate developer known for significantly improving neighborhoods such as South Street/Queen Village, South Broad Street and North Broad Street.

20.     Over the last 30 years, Mr. Blumenfeld has led numerous Philadelphia residential and commercial development projects.

21.     A Philadelphia native, Mr. Blumenfeld has been committed to the revitalization of South Street Headhouse District in Philadelphia.

22.     Over the past thirty years, Mr. Blumenfeld has introduced to the South Street Headhouse District numerous restaurants and retail stores, including its first T.G.I. Friday's franchise, David Brenner's Comedy club, and Chef's Market which is still considered one of Philadelphia's top gourmet markets, among many others.

23.     Abbotts Square is a large mixed-use "L" shaped building, at 200-210 Lombard Street in Philadelphia, and was developed by Mr. Blumenfeld's father in 1985.

24.     Abbotts Square has street level retail, second floor office space, a parking garage (more than 200 spaces), and multiple floors of residential units.

25.     The property is named after Abbotts Dairy, a Philadelphia dairy institution, which previously stood on the site.

4

Case ID: 230702187

26.     In addition to Abbotts Square's importance to Mr. Blumenfeld on a personal level, more importantly it is and has been part of his plan to revitalize the South Street/Headhouse area wherein the property sits.

27.     Giant is a grocery retailer and affiliate or subsidiary of Koninklijke Ahold Delhaize N.V., commonly known as, together with its affiliates and subsidiaries, Ahold Delhaize ("Ahold"), a Dutch multinational retail and wholesale holding company which owns and/or operates various retail brands including Giant Food brands.

28.     Upon information and belief, in or around 2014, Ahold introduced a concept for a small urban grocery store called "Bfresh", with its first location opening in Massachusetts, in 2015, which it operated under its Fresh Formats, LLC ("Fresh Formats") subsidiary.

29.     Fresh Formats, Giant, Ahold and Ahold U.S.A., Inc. are affiliate and/or related entities sharing common ownership and control.

30.     On March 9, 2016, Fresh Formats executed a Lease with plaintiff (the "Lease") pursuant to which it leased approximately 16,821 square feet of the ground floor area of Abbotts Square (hereinafter, the "Premises"), for purposes of opening and operating a "Bfresh" market.

31.     A true and correct copy of the Lease, together with the January 4, 2017 First Amendment to Lease, is attached hereto, collectively, as Exhibit "1".

32.     Ahold U.S.A., Inc. irrevocably and unconditionally guaranteed Giant's financial obligations under the Lease, including the payment of rent, and is joined herein pursuant to its guaranty made in favor of plaintiff.  A true and correct copy of the Guaranty is attached hereto as Exhibit "2".

33.     In early 2017, plaintiff tendered the Premises to Fresh Formats.

34.     Fresh Formats accepted the Premises and began paying rent to the plaintiff.

5

Case ID: 230702187

35.     In late 2017, Giant and/or Ahold decided that instead of a Fresh Formats "Bfresh" branded grocery store, Giant would construct and open a different Giant branded grocery store, called "Giant Heirloom Market", a new urban store concept different from Bfresh.

36.     On December 31, 2017, Fresh Formats and Giant entered into an Assignment and Assumption of Lease agreement (the "Assignment"), a true and correct copy of which is attached hereto as Exhibit "3".

37.     Pursuant to the Assignment, Giant accepted and assumed "the full and timely payment and performance of all of the covenants, agreements, terms, provisions, conditions. limitations and other obligations accruing and to be paid or performed on the part of Assignor [Fresh Formats] under the Lease…." *Id.*

38.     Pursuant to the Assignment, Giant "accept[ed] the Premises in 'as is' condition as the same exists on the date of this Assignment and Assumption of Lease...." *Id.*

39.     Upon information and belief, sometime in 2019 or early 2020, and potentially earlier, Giant and its representatives, Robinson and Markle, among others, decided that Giant would *not* open a Giant Heirloom Market at Abbotts Square.

40.     Upon information and belief, Giant concluded that a Giant Heirloom Market at Abbotts Square did not fit with its internal business model since it had opened three other Giant Heirloom Market stores in Philadelphia in 2019 and was planning to open a fourth Giant Heirloom Market store, which was to be its largest, in 2021, or for other undisclosed reasons unrelated to plaintiff and beyond its control.

41.     In this connection, Giant and its representatives, Robinson and Markle, among others, formulated an illicit scheme having multiple aims.

6

Case ID: 230702187

42.     Giant and its representatives, Robinson and Markle, among others, sought to shirk its payment obligations to plaintiff under the Lease.

43.     Giant and its representatives, Robinson and Markle, among others, sought to recoup the rents that Giant (and its predecessor) had paid to plaintiff.

44.     Giant and its representatives, Robinson and Markle, among others, also sought, at the same time, to keep the primary retail space at the Abbotts Square building in Philadelphia "off market" and "dark" (meaning without opening any store).

45.     Giant and its representatives, Robinson and Markle, among others, knew that, if Giant did not proceed with the store, plaintiff would seek to relet the space to potentially a store Giant viewed as a competitor.

46.     By keeping the space "off market" and "dark", Giant would be able to block plaintiff from reletting the space to one of its competitors.

47.     Additionally, by keeping the space "off market" and "dark", Giant and its representatives, Robinson and Markle, among others, sought to protect its revenues at the other Giant Heirloom Market stores it opened in the City of Philadelphia in 2019 and 2021 from being diminished by the additional supply created by a Giant Heirloom Market at Abbotts Square.

48.     In furtherance of the scheme, Giant and its representatives, Robinson and Markle, among others, concocted a bogus Lease "default", predicated upon an electrical service issue at the Premises.

49.     Specifically, Giant claimed that the electrical supply to the Premises was "120/208 volt" and less power than the "277/480 volt, 800 amp" service it claimed was required as part of plaintiff's "landlord's scope work" under the Lease.

Case ID: 230702187

50.     Giant relied upon Section 6.5 of Exhibit B to the January 4, 2017 First

Amendment to Lease which states:

> 6.5     ELECTRICAL
> Landlord shall provide metered electrical service to the demised Premises.
> Service to originate from existing Mezzanine service corridor re-using existing
> 277/480 volt, 800 amp bus duct switch and shall include service conduit, service
> conductors, Main Distribution Panel ("MDP") and circuit breakers as indicated
> on Drawing ED-1 Revision 1 dated 5/13/16 and on E-3 Revision 1, Mezzanine
> Plan dated 5/13/16.

*See* Ex. 1, hereto.

51.     In December 2020 in furtherance of their scheme, Giant stopped paying rent due

to plaintiff under the Lease predicated upon the aforesaid electrical service issue.

52.     Critically, the electrical work performed at the Premises in connection with

plaintiff's "landlord's scope work" under the Lease, and otherwise, was performed by A&E

Construction, including the ordering of materials and equipment.

53.     At all times material hereto, A&E Construction was Giant's contractor, and not

plaintiff's contractor.

54.     At all times material hereto, the electrical work at the Premises was done pursuant

to plans and drawings designed and prepared by Fresh Formats' and Giant's architect, JKRP

Architects, including work relating to the landlord's scope of work, and not the plaintiff.

55.     At all times material hereto, Fresh Formats and Giant were intimately involved

with, oversaw, and held responsibility for the electrical work that was performed by A&E

Construction and their agents, contractors, and professionals.

56.     While working within the Premises, Fresh Formats and Giant even tapped into

and made use of the electrical service at the Premises without complaint or issue.

8

Case ID: 230702187

57.     At all times material hereto, Fresh Formats and Giant were aware of and understood all matters relating and material to the electrical service at the Premises, including the power to the Premises.

58.     At all times material hereto, Fresh Formats and Giant accepted the Premises without complaint or issue and did so for years while also paying rent, notwithstanding any claim now that the electrical service was or is not as stated in the Lease or is deficient.

59.     The electrical service that Fresh Formats and Giant accepted at the Premises was the service that Fresh Formats and Giant planned for, implemented, bargained and/or arranged for, sought, agreed to, and/or accepted, notwithstanding any claim now that the power was or is not as stated in the Lease.

60.     James Sylvia, Giant's original authorized representative, confirmed as much on multiple occasions to the plaintiff.

61.     Any claimed deficiencies with the electrical service, including that the power to the Premises was or is not as stated in the Lease, were caused by and the result of the acts and omissions of Fresh Formats and Giant and their agents and representatives or others over whom plaintiff has no control.

62.     As Giant and its professionals well know, the electrical service to the Premises has never been a secret, is open and obvious and cannot be concealed, and is easily determinable.

63.     Any claim or assertion by Giant that it was ever unaware of the electrical service to the Premises or that it was not what it planned for, implemented, bargained and/or arranged for, sought, agreed to, and/or accepted, is absurd, inaccurate, and unfounded.

64.     In furtherance of its scheme, on June 1, 2023, Giant and its representatives, Robinson and Markle, advised plaintiff that it would not open a grocery store at Abbotts Square.

Case ID: 230702187

65.     In furtherance of its scheme, on June 1, 2023, Giant and its representatives, Robinson and Markle, claimed that the store was not economically feasible without plaintiff providing Giant with more than $30 million in up front contributions and free rent for ten years.

66.     Giant and its representatives, Robinson and Markle, knew that plaintiff could not and would not agree to any such concessions, which were solicited by them in bad faith and only to provide further cover for its illicit scheme and unlawful actions.

67.     At no time prior to June 1, 2023, did Giant or any of its representatives advise or indicate to plaintiff that the store was not economically feasible or that, to proceed with a store, plaintiff would have to provide $30 million in up front contributions and free rent for ten years.

68.     Upon information and belief, Giant's representations to plaintiff were knowingly false when made, uttered in bad faith and to provide cover for its illicit scheme and unlawful actions.

69.     Assuming *arguendo* that Giant's representations concerning the feasibility of the store and its need for the outlandish concessions from plaintiff were true, at all times material hereto, Giant and its representatives, including Robinson and Markle, concealed and failed to disclose such facts to plaintiff, including at times where the store's economics was discussed and where any reasonable person not seeking to defraud the other party would have disclosed the truth.

70.     At all times material hereto, plaintiff has acted in good faith and in reliance upon the representations of Giant and its representatives, including Robinson and Markle, that Giant would open a Giant Heirloom Market store at Abbotts Square.

71.     At all times material hereto and prior to June 1, 2023, Giant represented to plaintiff that it was diligently working to open a Giant Heirloom Market at Abbotts Square.

Case ID: 230702187

72.     At all times material hereto prior to June 1, 2023, when plaintiff questioned Giant and its representatives, including Messrs. Robinson and Markle, whether Giant would open a Giant Heirloom Market at Abbotts Square, Giant, and its representatives, including Robinson and Markle, answered in the affirmative.

73.     The foregoing representations to plaintiff by Giant and its representatives, including Robinson and Markle, were knowingly false when made.

74.     At all times material hereto, Giant and its representatives, including Robinson and Markle, failed to disclose and intentionally concealed from plaintiff their scheme including their decision not to proceed with a Giant Heirloom Market at Abbotts Square.

75.     Giant and its representatives, including Robinson and Markle concealed from the plaintiff its decision not to proceed with a Giant Heirloom Market at Abbotts Square on multiple occasions where the topic was discussed and where any reasonable person not seeking to defraud the other party would have disclosed the truth.

76.     Giant and its representatives, including Robinson and Markle, nevertheless caused plaintiff to incur substantial cost and expense working with Giant in furtherance of Giant opening a store while concealing the fact that it had decided not to do so and had ulterior and illicit motives.

77.     Defendants' actions have caused plaintiff to suffer substantial losses and other harm, including harm with other tenants at Abbotts Square.

78.     Giant has not paid rent since November 2020.

79.     By letter dated December 23, 2020, plaintiff declared a default for the nonpayment of rent, providing written notice to Giant and Ahold U.S.A., Inc.  A true and correct copy of the default letter is attached hereto as Exhibit "4".

Case ID: 230702187

80. Both Giant and Ahold U.S.A., Inc. failed to cure the default under the Lease.

81. By letter dated June 14, 2023, Stobba accelerated all amounts due and owing under the Lease. To date, neither Giant nor Ahold U.S.A., Inc. has responded to the letter.

82. To date, Giant owes the plaintiff not less than $16,000,000 in unpaid rent and other costs and expenses due under the Lease.

83. Since the execution of the Lease, Fresh Formats and Giant and their agents and professionals have substantially modified and altered the Premises, including demolishing more than twenty (20) separate demised premises.

84. By doing so, *inter alia*, they substantially reduced the leasable floor space to the detriment of the plaintiff.

85. Restoring the Premises to its previous condition is estimated to cost between approximately $15,000,000 to $20,000,000.

### COUNT I
### FOR BREACH OF CONTRACT AND
### BREACH OF GOOD FAITH AND FAIR DEALING

86. Plaintiff incorporates all of the foregoing paragraphs by reference as though set forth in full herein.

87. The Lease is an enforceable and binding agreement between Giant and plaintiff.

88. By doing the things alleged herein, Giant has breached the Lease by, *inter alia*, failing to pay rent and other amounts due under the Lease, despite notice and demand.

89. Moreover, at all times material hereto, Giant owed plaintiff a duty of good faith and fair dealing.

90. Giant's acts and omissions, as aforesaid, constitute a breach of those duties.

12

Case ID: 230702187

91.     In doing the things herein alleged, Giant has acted intentionally, willfully, wantonly and with utter disregard for plaintiff's rights.

92.     Giant acted in bad faith and for illegitimate purposes such as avoiding paying rent, blocking competition, and protecting sales at its other Giant Heirloom Market stores.

93.     As a direct and proximate result of Giant's breaches of contract and breaches of its duty of good faith and fair dealing, plaintiff has suffered substantial damages.

94.     Plaintiff has performed its duties and obligations in accordance with the terms of the Lease, unless otherwise prevented from doing so by Giant and its agents and affiliates.

WHEREFORE, plaintiff demands judgment in its favor and against defendant Giant for all compensatory, consequential, and incidental damages, and attorneys' fees, and all other amounts recoverable under the Lease, together with interest and costs and for such relief as the Court may deem proper and necessary.

## COUNT II
## FOR BREACH OF CONTRACT
### (Against Ahold U.S.A., Inc.)

95.     Plaintiff incorporates all of the foregoing paragraphs by reference as though set forth in full herein.

96.     Ahold U.S.A., Inc. executed and delivered to plaintiff a binding and enforceable Guaranty.

97.     Pursuant thereto, *inter alia*, Ahold U.S.A., Inc. irrevocably and unconditionally guaranteed Giant's financial obligations under the Lease, including the payment of rent.

98.     Ahold U.S.A., Inc. has failed to perform under the Guaranty and is in breach thereof.

13

Case ID: 230702187

99.     Ahold U.S.A., Inc. agreed to be joined and is hereby joined to this action pursuant to the Guaranty it made in favor of the plaintiff.

100.    As a direct and proximate result of Ahold U.S.A., Inc.'s breaches of contract, plaintiff has suffered substantial damages.

WHEREFORE, plaintiff demands judgment in its favor and against defendant Ahold U.S.A., Inc. for all compensatory, consequential, and incidental damages, and attorneys' fees, and all other amounts recoverable under the Guaranty, together with interest and costs and for such relief as the Court may deem proper and necessary.

### COUNT III
### FOR PROMISSORY ESTOPPEL/DETRIMENTAL RELIANCE

101.    Plaintiff incorporates all of the foregoing paragraphs by reference as though set forth in full herein.

102.    As alleged herein, Giant, and its representatives, including Robinson and Markle, made representations, statements, agreements, and promises to plaintiff concerning a Giant Heirloom Market store at Abbotts Square.

103.    Defendants' representations, agreements, statements, and promises were reasonably expected to induce action or forbearance on the part of plaintiff.

104.    Plaintiff acted and/or refrained from acting in reliance on said representations, statements, agreements, and promises.

105.    As alleged herein, defendants violated said representations, agreements, statements, and promises made to plaintiff.

106.    Injustice can be avoided only by enforcing against defendants said representations, agreements, statements and promises to plaintiffs.

Case ID: 230702187

WHEREFORE, plaintiff demands judgment in its favor and against defendants for all compensatory, consequential, and incidental damages, and attorneys' fees, together with interest and costs and for such relief as the Court may deem proper and necessary.

## COUNT IV
## FOR FRAUD, MISREPRESENTATION AND CONCEALMENT

107.    Plaintiff incorporates all of the foregoing paragraphs by reference as though set forth in full herein.

108.    As alleged herein, defendants made false representations, statements, and promises to plaintiff relating to a Giant Heirloom Market store at Abbotts Square, including the construction and opening thereof.

109.    As alleged herein, defendants concealed from plaintiff material facts concerning the opening of a Giant Heirloom Market store at Abbotts Square.

110.    As alleged herein, defendants' false, deceptive, and misleading representations, statements, promises, actions, and omissions were made with the intent to induce plaintiff to rely upon them.

111.    Defendants' deceptive and misleading representations, statements, promises, and actions directed at plaintiff were knowingly false.

112.    Plaintiff justifiably relied upon defendants' representations, statements, promises, and actions.

113.    As a result of the defendants' unlawful acts and omissions, alleged herein, plaintiff has suffered and continues to suffer substantial damages in an amount to be determined at trial.

WHEREFORE, plaintiff demands judgment in its favor and against defendants for all compensatory, consequential and incidental damages, punitive damages, interest, and attorneys'

Case ID: 230702187

fees, together with interest and costs and for such relief as the Court may deem proper and necessary.

**COUNT V**
**FOR DECLARATORY JUDGMENT**
**(In the alternative to Count I)**

114.    Plaintiff incorporates all of the foregoing paragraphs by reference as though set forth in full herein.

115.    An actual justifiable controversy has arisen and presently exists as to whether, *inter alia*, the electrical service at the Premises was as Fresh Formats and Giant planned for, implemented, bargained and/or arranged for, sought, agreed to, and/or accepted, notwithstanding any claim now that the power was or is not as stated in the Lease.

116.    A declaratory judgment is necessary and proper to set forth the rights and obligations that exist among the parties with respect to the Lease, as aforesaid.

117.    Plaintiff is entitled to judicial declarations in its favor as aforesaid and that Giant materially breached the Lease and otherwise engaged in unlawful conduct for the reasons set forth herein, and that plaintiff is not in material default of the Lease.

118.    Plaintiff has a direct, substantial, and present interest in this litigation.

119.    A declaratory judgment is proper in this litigation because a declaration of plaintiff's rights is a bona fide necessity for them to carry on with its business.

///

16

Case ID: 230702187

WHEREFORE, plaintiff demands declaratory judgment relief as alleged herein in its favor and against Giant together with attorneys' fees, interest and costs and for any such additional relief as the Court may deem proper and necessary under the circumstances.

Respectfully submitted,

**BRAVERMAN KASKEY GARBER PC**

Dated: July 21, 2023                    BY:    */s/ Benjamin A. Garber*
                                                BENJAMIN A. GARBER, ESQUIRE
                                                *Attorneys for Plaintiffs*

Case ID: 230702187

## **VERIFICATION**

I, Eric Blumenfeld, hereby verify that I am authorized to sign this Verification on behalf of the plaintiff and that the factual statements made in the foregoing Complaint, are true and correct to the best of my knowledge, information and belief.  I understand that if any of these statements are factually false, I am subject to punishment pursuant to Pa. C.S. § 4904 relating to unsworn falsification to authorities.

_____
Eric Blumenfeld

Case ID: 230702187



*Filed and Attested by the
Office of Judicial Records
21 JUL 2023 04:35 pm
S. RICE*

# Exhibit 1

Case ID: 230702187

LEASE

by and between

STOBBA ASSOCIATES, L.P.


And

FRESH FORMATS, LLC


for
Premises Located
at


201 South Street (Abbotts Square), Philadelphia, PA

8-7-15

Case ID: 230702187

<u>INDEX TO LEASE</u>

| <u>Article</u> | <u>Caption</u> | <u>Page</u> |
|---|---|---|
| I. | PREMISES | |
| II. | TERM OF LEASE | |
| III. | MINIMUM RENT | |
| IV. | TAXES | |
| V. | MAINTENANCE OF COMMON AREAS AND TENANT'S CONTRIBUTION | |
| VI. | UTILITIES | |
| VII. | INITIAL CONSTRUCTION | |
| VIII. | USE, RESTRICTIONS, ASSIGNMENT AND SUBLET | |
| IX. | MAINTENANCE OF BUILDINGS | |
| X. | LIABILITY AND PROPERTY DAMAGE INSURANCE, INDEMNITIES | |
| XI. | MUTUAL SELF-HELP | |
| XII. | DAMAGE CLAUSE | |
| XIII. | EMINENT DOMAIN | |
| XIV. | REPRESENTATIONS AND WARRANTIES | |
| XV. | REMEDIES | |
| XVI. | MISCELLANEOUS PROVISIONS | |

<u>EXHIBITS</u>

| EXHIBIT A-1 | SITE PLAN |
|---|---|
| EXHIBIT A-2 | METES AND BOUNDS DESCRIPTION OF THE [LAND] <u>OR</u> [SHOPPING CENTER] |
| EXHIBIT B | LANDLORD'S WORK |
| EXHIBIT B-1 | TENANT'S WORK |
| EXHIBIT C | LIST OF EXCLUSIVE OR USE RESTRICTIONS |
| EXHIBIT D | TITLE EXCEPTIONS |
| EXHIBIT E | NON-DISTURBANCE AGREEMENT |
| EXHIBIT F | FORM OF GUARANTY |

Case ID: 230702187

<u>LEASE</u>

THIS Lease, made as of the _____ day of _____, 2016, by and between STOBBA ASSOCIATES, L.P., a Pennsylvania limited partnership, with an address at 530 South 2nd Street, Philadelphia, Pennsylvania ("Landlord") and FRESH FORMATS, LLC, a Delaware limited liability company, with an address at 780 Dedham Street, Suite 600, Canton, Massachusetts ("Tenant").

<u>WITNESSETH</u>:

ARTICLE I.
<u>Premises</u>

1.1.    <u>Lease of the Premises</u>.  Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, upon and subject to the terms and provisions of this Lease and for the term hereof, the premises consisting of approximately 16,821 square feet of ground floor area as more particularly shown on the space plan hereto attached as **Exhibit A** (the "Premises") located in the Building (defined below) located in the City of Philadelphia, Commonwealth of Pennsylvania, together with (a) the non-exclusive right and privilege for Tenant and its customers, employees and invitees and the customers, employees and invitees of any permitted assignee, sublessee, concessionaire or licensee of Tenant, to use the Common Areas of the Building and any outdoor Common Areas without charge (except to the extent provided in Section 5.2 hereof) in common with Landlord and the other tenants and occupants of floor area within the Building and their respective customers, employees and invitees; and (b) such other rights and privileges as may be granted to Tenant pursuant to the terms hereof. The boundaries of the parcel of land on which the Building is located are shown on the Site Plan annexed hereto and made a part hereof as **Exhibit A-1** (hereinafter referred to as the "Site Plan") and a metes and bounds description thereof is annexed hereto and made a part of **Exhibit A-2**. The building in which the Premises are located contains approximately 47,276 square feet of retail space, and is identified on the Site Plan as the "Building". Tenant shall also have the right to use the area adjacent to the Premises and shown on the Site Plan as "Outdoor Seating and Sales Area" for outdoor seating (the "Outdoor Seating and Sales Area") and sales, subject to the terms of this Lease, provided that Tenant is responsible to obtain any required licenses and permits for such use and that such use is permitted by any applicable governing authority.

1.2.    <u>Floor Area Defined</u>.  The term "Floor Area", as used in this Lease, shall be computed on the basis of the exterior of exterior walls and the center of interior or dividing walls and shall exclude (i) any non-selling mezzanines or other areas housing mechanical, electrical, telephone, air-conditioning and similar equipment including any computer equipment not used for sale or lease to third persons and used primarily by Tenant, (ii) any exterior garbage collecting areas and (iii) the Outdoor Seating and Sales Area.

Case ID: 230702187

1.3. <u>Size of Premises</u>. With regard to rental payable during the original term and the option periods, and with regard to Tenant's Tax Percentage and Tenant's CAM Percentage, the amounts set forth in this Lease are predicated upon the square footage figures for the Premises and Building recited herein. Promptly upon delivery of full possession of the Premises by Landlord to Tenant, an exact measurement of the square footage of floor area of the Premises and the Building shall be made, and if said measurement shall indicate square footage figures consistent with the plans for Landlord's Work differ from those recited in this Lease, the parties hereto shall promptly execute a supplemental instrument adjusting, as applicable, Tenant's Tax Percentage and Tenant's CAM Percentage, to conform to the exact measurement, but the Minimum Rent shall not be affected. If Tenant shall have made any payments to Landlord prior to the determination of such exact measurement, a prompt adjustment shall be made in said payments to reflect the accurate figures.

ARTICLE II<br>Term of Lease

2.1. <u>Original Term</u>. The initial term of this Lease shall begin on the Commencement Date (as hereinafter defined) and continue until the last day of the tenth (10th) Lease Year, unless earlier terminated or extended, as expressly provided in this Lease.

2.2. <u>Commencement Date; Tender of Possession</u>. The Commencement Date shall occur on the date which is the earlier of (i) the date Tenant opens for business to the Public, or (ii) the date which is one hundred twenty (120) days following the later of (a) Landlord's Tender of Possession, or (b) the issuance of a Building Permit for Tenant's Work. Notwithstanding anything to the contrary Tender of Possession shall not occur until Landlord and Wawa enter into a written lease amendment containing the following restriction language on Wawa' permitted use (the" Wawa Restriction").

During the term of the Fresh Formats/ bfresh lease, it is expressly agreed that the premises subject to the Wawa Lease (or any expansion or modification thereof) shall not be used primarily as a *"retail grocery store"*. The term "Retail Grocery Store shall mean a retail operation which falls into one or more of the following classifications: supermarket, or specialty food store, including but not limited to the type of store operated by Tenant, Whole Foods, Trader Joes, Sprouts Farmers Market, The Fresh Market, Balducci's. Mrs. Greens Natural Market, Citarella, Fairway markets, and Mom's Organic Market, which may, in addition to selling food items and food products for on or off -premises consumption, specifically including but not limited to fresh produce, ready to eat ("grab and Go") offerings as well as prepared foods, as well as general merchandise, and beer and/ or wine for off-premises consumption.

-4-

Case ID: 230702187

For the purposes of this Lease, Tender of Possession shall be deemed to have occurred when Landlord has delivered evidence of said restriction being a part of the Wawa lease amendment and Landlord has substantially completed Landlord's Work required by **Exhibit B** annexed hereto and made a part hereof. Landlord's Work shall be deemed "substantially completed" if Landlord's Work has been completed with the exception of minor items which can be completed within ten (10) days without materially interfering with Tenant's Work hereunder. All of the provisions of said Exhibit B are hereby incorporated herein in full by this reference as though fully set forth in the body of this Lease. Tenant shall apply for a Building Permit within 30 days of Landlord's Tender of Possession, and pursue its issuance expeditiously, and Landlord shall reasonably cooperate with Tenant in this effort. If however all required building permits and approvals have not been issued to Tenant within ninety (90) days of application then (a) Landlord may by written notice sent not less than five (5) days before the end of the ninetieth (90th) day, take over the attempt to obtain approvals and permits within the next following sixty (60) days, or (b) if no notice is forthcoming from Landlord then Tenant may terminate this Lease upon ten (10) days written notice, or if Landlord sends the notice discussed in (a) above, Tenant's termination right shall not accrue until sixty five (65) days from the date of Landlord's notice. As soon as the Commencement Date has been determined, the parties hereto agree to execute a supplemental instrument memorializing said date. For purposes of this Lease, the first "Lease Year" shall commence on the Commencement Date and end of the last day of the month in which the first anniversary of the Commencement Date occurs. Each subsequent Lease Year shall be the twelve (12) month period commencing on the first day of the month following the month in which the anniversary of the Commencement Date occurs. If Tender of Possession (as defined herein) does not occur on or before July 15, 2016, Tenant shall have the right in its sole and absolute discretion to cancel this Lease upon written notice to Landlord.

    2.3.  <u>Extension Options</u>. Tenant shall have three (3) successive five (5) year options followed by one (1) additional option of four (4) years and six (6) months to extend the term of this Lease, provided written notice of the election of such option(s) shall be sent by Tenant to Landlord: (i) not less than nine (9) months prior to the expiration of the then current term (initial or extended); or (ii) within twenty (20) days after receipt of timely notice from Landlord to Tenant that Tenant has failed to exercise its option of extension within the time period provided in (i) above, and the option(s) of extension shall not lapse until after the expiration of said 20-day period following receipt of Landlord's notice. If said option(s) are duly exercised, the term of this Lease shall be automatically extended for the period of the next ensuing option, without the requirement of any further instrument, upon all of the same terms, provisions and conditions set forth in this Lease, except that the minimum rent during the option periods shall be as set forth in Section 1 of Article III hereof. If Landlord and Tenant should mutually decide to a fifth extension term (with each party agreeing to be reasonable) the parties agree that a written amendment shall memorialize said extension and the Parties agree that any Rent shall be determined at fair market value.

Case ID: 230702187

In the event that the aforesaid option(s) to extend are duly exercised, all references contained in this Lease to the term hereof, shall be construed to refer to the initial term hereof, as extended, whether or not specific reference thereto is made in this lease.

ARTICLE III.
Minimum Rent

3.1. Minimum Rent. Tenant covenants and agrees to pay to Landlord minimum rent for the Premises at the following rates (the "Minimum Rent"):

| Period | Annual Minimum Rent | Monthly Minimum Rent |
|---|---|---|
| Lease Years 1 through 5 | $597,360.60 | $49,780.05 |
| Lease Years 6 through 10 | $657,031.80 | $54,752.65 |
| 1st Extension Period | $722,702.52 | $60,225.21 |
| 2nd Extension Period | $795,021.48 | $66,251.79 |
| 3rd Extension Period | $874,474.92 | $72,872.91 |
| 4th Extension Period | $961,873.80 | $80,156.15 |

3.2. Payment of Minimum Rent. Monthly installments of Minimum Rent shall be payable on the first day of each and every calendar month, during the term hereof, in advance and without any set-off or deduction except as may be expressly set forth in this Lease. The first such payment shall be due on the Commencement Date. In the event Tenant is obligated to pay minimum rent for a period which is less than a calendar month, the minimum rent stated as payable pursuant to Section 3.1 hereof shall be prorated based upon the ratio which the number of days in such partial month bears to the total number of days in the month in which such partial month occurs.

ARTICLE IV.
Taxes

4.1. Taxes Defined. For the purposes hereof, the term "real estate taxes" shall mean all ad valorem real estate taxes payable on account of the Building ("Building Taxes") and any and all ad valorem real estate taxes payable on account of the area of the parcel of land on which the Building is located ("Land Taxes"), which said land area is described in the metes and bounds description thereof contained in **Exhibit A-2.** The term "real estate taxes" shall also include such taxes as may be imposed in lieu of ad valorem real estate taxes, provided, however, that in no event shall Tenant be responsible to pay any inheritance, estate, succession, transfer or gift tax imposed on Landlord or any

-6-

Case ID: 230702187

income tax or any other like tax which is measured in any manner by the income or profit of Landlord.

4.2.  Payment of Taxes.  The initial responsibility for the payment of all real estate taxes on the retail portion of the Building shall be upon Landlord, and Landlord agrees to pay the same as required by law. Landlord shall furnish to Tenant copies of all tax bills promptly upon receipt thereof as provided in Section 4.3 below.

4.3.  Tenant's Share of Taxes.  Provided Landlord shall have complied with the requirements of Section 4.2 above, Tenant shall pay to Landlord, as additional rent thirty five and 60/100ths percent (35.6%) ("Tenant's Tax Percentage") of the Building Taxes and Land Taxes for and with respect to the term hereof.  Tenant's Tax Percentage is computed on the basis of the Premises containing 16,831 square feet of Floor Area, as compared to a total of 47,276 square feet of Floor Area of the Building on all retail floors (but excluding from both any mezzanine or basement level not used for sales purposes and excluding the Outdoor Seating and Sales Area).  The real estate taxes for which Tenant is, in part, responsible hereunder shall be the real estate taxes, as the same may be reduced by any reduction in the amount as originally assessed, whether by reason of abatement or otherwise.

Such tax payments from Tenant to Landlord shall be due and payable not later than 15 days after receipt of a copy of the Bill to be paid with Tenant's share specified and calculated.  Upon written request of Tenant, Landlord shall furnish to Tenant copies of receipted tax bills showing payment in full of any real estate taxes in which Tenant is required to share pursuant to the terms hereof.

A fair and equitable adjustment shall be made with respect to any tax payments due from Tenant to Landlord in connection with the first and last periods of the term of this lease, since the same may not coincide with the tax years involved.

## ARTICLE V
### Maintenance of Common Areas and Tenant's Contribution

5.1.  Landlord's Maintenance Obligation.  Landlord agrees to maintain all Common Areas (as hereinafter defined) of the Building in good order, condition and repair and in a safe, clean, sightly and sanitary condition in accordance with first class retail center management practices. The Landlord shall also maintain the Parking area and facilities in a manner consistent with a first class building, including snow removal and striping. The term "Common Areas" is hereby defined to mean those portions of the Building made available for the general, nonexclusive use, convenience and benefit of all occupants of the Building and their respective customers, employees and invitees, including, without limitation, delivery passages, access and egress entrances, walkways, sidewalks, aisles, landscaped and planted areas, fire and service corridors and public restrooms. The maintenance obligations of Landlord shall include, without limitation, the prompt cleaning and removal of ice and snow  sidewalks, prompt repairing of Common Areas, maintenance of landscaping and adequate lighting of all exterior Common Areas

-7-

Case ID: 230702187

during all hours of darkness during which Tenant shall be open for business and for one (1) hour thereafter.

    5.2.  <u>Tenant's Rights in the Common Areas</u>.  Landlord agrees that Tenant shall have the continuous, nonexclusive right (in common with all other occupants from time to time of the Building) to use the parking facilities (defined as the lower garage of the Building which is not deemed Common Area for purposes of Tenants CAM payments) and all other Common Areas of the Building during the term for use by Tenant and its subtenants, licensees, customers, guests, invitees, employees and agents. No change shall be made in any parking areas, approaches, exits, entrances, roadways, and the like as shown on the Site Plan, except that Tenant agrees that Landlord may upon prior written notice temporarily close portions (not to exceed 25% of such parking areas for refurbishment at a time), and for not longer than sixty (60) days in total.  If any such change shall be required by applicable law, and such change shall have any material adverse effect whatsoever on Tenant, or on the operation of Tenant's business in the Premises, Landlord and Tenant shall use all reasonable efforts to agree upon suitable alternative parking arrangements.  Until such suitable alternative parking arrangements are available to Tenant's customers, Tenants Rent shall be reduced by 20%.

    5.3.  <u>Construction</u>.  In the event any Future Construction is to be conducted during such time as the Premises shall be open for business to the public (i) Landlord agrees to erect, or cause to be erected, adequate, painted construction barricades substantially enclosing the areas of such construction, such barricades to be maintained until such construction has been substantially completed (and thereafter shall be immediately removed), (ii) prior to erecting any barricades or scaffolding blocking any of Tenant's signs, Landlord shall construct, at its sole cost and expense, temporary signage preapproved by Tenant, such approval not to be unreasonably withheld, (iii) no trucks, construction equipment or machinery shall be allowed to use any portion of the Common Areas other than Common Areas immediately adjacent to the construction site, (iv) all construction materials, mud and debris shall be cleared daily from the site, except those portions of the Common Areas that are located within the construction barricades, and (v) all such construction shall be conducted in a manner which will not interfere with the operation of business in the Building, and if any such construction would interfere with Tenant's business operations, access or visibility, such construction shall be performed after business hours. Landlord shall coordinate all construction activity which could impact Tenant's store operations with Tenant's store manager to minimize Future Construction impact on Tenant's operations. All proposed construction is shown on the Site Plan as "Future Construction".

    5.4.  <u>Tenant's Share of Common Area Maintenance Costs</u>. Tenant agrees to pay to Landlord as Tenant's agreed-upon share of the reasonable cost its share of maintaining and providing security for and liability insurance (as described in Section 10.1 hereof of this Lease) with respect Common Areas during the term hereof an annual charge, as additional rent, equal to thirty five and 60/100's percent (35.6%) ("Tenant's CAM Percentage") of such Common Area costs.  Tenant shall pay to Landlord Tenant's CAM Percentage monthly in advance in equal installments. The costs in which Tenant is to share pursuant to this Section 5.4 shall not include the following: (i) management fees or

-8-

Case ID: 230702187

administrative charges or other like fees, however denominated to the extent they exceed 6% of total common area costs exclusive of the costs of utilities and insurance; (ii) the cost of removing any tenant or occupant of the Building; and (iii) any expense, other than expenses for which Tenant is responsible under this Article V incurred by Landlord in complying with Landlord's obligations under this Lease, and (iv) any costs attendant with the operation or maintenance of the Parking Facilities. The costs in which Tenant is to share pursuant to this Section 5.4 shall include capital improvements to the Common Areas (excluding the Parking Facilities) and any replacements of equipment serving the Premises, which shall be amortized over the useful life of such improvements and equipment, and in no event shall capital improvements exceed 6% of the annual CAM payment. Tenant's CAM Percentage is computed on the basis of the Premises containing 16,831 square feet of Floor Area as compared to a total of 47,276 square feet of floor area of the Building on all floors (but excluding from both any mezzanine or basement level not used for sales purposes and excluding any Outdoor Sales Area). For the period beginning on the Commencement Date and ending on the last day of the calendar month immediately preceding the delivery by Landlord to Tenant of the first annual statement described in the next paragraph hereof, the foregoing charge shall be the Lesser of (i) the actual CAM cost attributable to Tenant or (ii) $4.16 per square foot of the Premises. For subsequent periods the foregoing charge shall be based upon Landlord's actual charges for the most recent calendar year for which such charges have been determined, exclusive of any extraordinary charges, applicable to such calendar year. Notwithstanding the foregoing, in no event shall Tenant's share of the foregoing costs increase by more than the CPI (as determined by the appropriate governmental agency) for the Philadelphia metro area, in any Lease Year over the amount of such costs in the prior Lease Year.

5.5. <u>Common Area Expense Reconciliation.</u> Within ninety (90) days after the end of each calendar year during the term hereof, Landlord shall furnish to Tenant a statement in reasonable detail with appropriate backup, setting forth the computation of the foregoing total costs and expenses, and setting forth Tenant's share thereof. Tenant shall, within thirty (30) days after receipt of Landlord's statement, pay to Landlord or Landlord shall reimburse Tenant, as applicable, the amount of any adjustment, to the end that Landlord shall be entitled to receive Tenant's said share and no more. A fair and equitable adjustment shall be made with respect to any such payments due from Tenant to Landlord in connection with the last period of the term of this lease, since the same may not coincide with the payment periods involved.

5.6. <u>Audits.</u> Landlord shall keep all of Landlord's records relating to the costs and expenses in which Tenant is required to share pursuant to this Article V as well as the real estate taxes in which Tenant is required to share pursuant to Article IV hereof for a period of at least two (2) years following the end of each calendar year, and Tenant shall have the right to audit and inspect the same by providing notice of such audit prior to the end of the two (2) period. Appropriate adjustments shall be made for errors in the amount of such computations revealed by such audit or inspection. If any such audit or inspection by Tenant indicates an overcharge in the amount of Tenant's share of such costs and expenses or such real estate taxes by more than five percent (5%), the reasonable costs of such audit or inspection shall be paid on demand to Tenant by Landlord; otherwise, the expenses of Tenant's audit or inspection shall be borne by Tenant. If there has been an

-9-

Case ID: 230702187

overcharge and a resulting overpayment by Tenant, such amount shall be reimbursed by Landlord to Tenant within thirty (30) days, or Tenant may withhold said overpayment from future Common Area Expenses until reimbursed in full.

## ARTICLE VI
### Utilities

6.1.    Utilities.  Landlord shall provide, or cause to be provided, the facilities necessary to enable Tenant to obtain gas, water, electricity, heating, telephone and sanitary sewer service in such locations as shall be designated by Tenant. Tenant agrees to pay, directly to the authority or entity charged with the collection thereof, all charges for gas, electricity, cable, water, telephone, trash collection and other utilities used or consumed by Tenant at the Premises during the Term, and shall make its own arrangements for such utilities. Landlord agrees to cooperate with Tenant in order for Tenant to obtain such utilities and services. Landlord represents and warrants that the utilities serving the Premises are or will be on or prior to Tender of Possession separately metered or sub-metered for utilities at Landlord's sole cost and expense.

Case ID: 230702187

## ARTICLE VII
### Initial Construction

7.1.   Landlord's Work.  Set forth on **Exhibit B** hereto are the various items of Landlord's Work (which term when used in this Lease shall have the meaning set forth in said Exhibit B) to be performed within the time limits set forth therein, and Landlord agrees to do all of the same in accordance with the provisions of said **Exhibit B**.

7.2.   Tenant's Work.

(a)   Except for Landlord's Work as provided in Section 7.1 hereof, at Tenant's sole cost and expense, Tenant shall do any and all work which Tenant desires to adapt the Premises to Tenant's use subject to Landlords prior written approval which shall not be unreasonably withheld conditioned or delayed (collectively, the "Tenant's Work"). Tenant's Work as outlined herein on Exhibit B-1 is hereby approved by Landlord. Tenant shall do all of Tenant's Work in a good and workmanlike manner and in compliance with all applicable laws, and in a manner required by applicable codes so that, insofar as Tenant's Work is concerned, Tenant will be able to secure for Tenant a Certificate of Occupancy from applicable authorities to enable Tenant to open and conduct business in the Premises.

(b)   All changes in the Tenant's Plans (each, a "Plan Change"), shall be subject to the approval of Landlord, which approval shall not be unreasonably withheld, conditioned or delayed. Landlord shall, within three (3) days after receipt of a Plan Change notify Tenant of its approval (which approval shall not be unreasonably withheld, conditioned or delayed) or disapproval of the Plan Change.  If Landlord fails to deliver said notice to Tenant within three (3) days, the Plan Change shall be deemed approved. If Landlord disapproves Plan Change, Landlord shall state specifically the reasons for such disapproval and provide a detailed description of the revisions to the Plan Change that Landlord requires in order to grant approval, and thereafter Tenant shall cause its architects to promptly make any such changes reasonably required by Landlord. If Landlord approves any change in the Tenant's Plans, Tenant may construct, at Tenant's sole cost and expense, the Tenant Improvements in accordance with such change.

## ARTICLE VIII
### Use Clause and Restrictions

8.1.   Permitted Use.  The Premises may be used for a grocery store offering fresh and prepared foods and grocery items for consumption on and off the Premises, and/or for any lawful retail use (and for office and storage ancillary thereto) (the "Permitted Use").  Notwithstanding the foregoing, the Premises shall not be used (i) for any of the Prohibited Uses set forth in Section 8.2, below, or (ii) for any use which would violate any exclusive covenant in effect at the time of Tenant's proposed change in use previously granted to another tenant in the Building, provided Landlord has given written notice of all such exclusives to Tenant.

Case ID: 230702187

8.2.   <u>Prohibited Uses</u>.  Landlord specifically agrees with Tenant as follows:

(a)  Landlord agrees during the term of this Lease that it will not lease, sell or otherwise permit any part of the Building to be used in whole or in part for a so-called "off-track betting" operation; or for the sale or display of pornographic materials, or any other use that would be considered a noxious or a nuisance, which would not be appropriate for a urban building.

8.3.   <u>Tenant's Hours of Operation</u>.  It is specifically understood and agreed that Tenant may keep open for business beyond the closing hours of others, and may also, if not prohibited by law, keep open for business on other than regular business days. However, nothing herein shall require Tenant to open for business or to continuously operate in the Premises. Notwithstanding the immediately preceding sentence, Tenant agrees that is shall open for business for a period of one (1) day as a typical operation substantially similar to other Tenant operated operations. In the event Tenant or any assignee or subtenant ceases operating the Premises for the Permitted Use at any time during the Term for six (6) consecutive months or more (or for any six (6) months during any twelve (12) consecutive month period) (except for closures due to casualty or condemnation as herein provided), Landlord shall have the right to recapture the Premises within the three month period immediately thereafter upon sixty (60) days' notice to Tenant. At the expiration of such sixty (60) day period, this Lease shall terminate with the same force and effect as if such date was the expiration date hereunder, and Landlord shall be obligated to pay to Tenant the unamortized cost (amortized over the length of the then current term) of leasehold improvements made by Tenant to the Premises including by way of example and not limitation, structural improvements ductwork, vertical transportation, supplemental heating and cooling and utility upgrades and installations.

8.4.   <u>Tenant's Exclusive</u>.  During such time as Tenant or anyone claiming under Tenant shall use or occupy the Premises for a grocery store, Landlord agrees that it will not directly or indirectly lease, use, operate or permit to be used any part of the Building for the operation of a store whose primary use, or if not the primary use, use of more than 15% of leased space, is for the is for the sale of food for off-premises consumption, or the operation of a grocery store, except for (a) restaurants (including without limitation casual and/or fast food restaurants such as Panera Bread, Chipotle Mexican Grill, McDonald's, Le Pain Quotidien), (b) coffee and tea shops (such as Starbucks and Teavana), (c) donut shops (such as Dunkin Donuts) and (c) snack bars in retail stores (such as Barnes & Noble), none of which shall be deemed to violate Tenant's exclusive hereunder. In addition, none of the following uses will be deemed to violate Tenant's exclusive hereunder: florists, delicatessens, diners, health food or vitamin stores substantially similar to GNC, stores that specialize in healthy foods, wraps, shakes, yogurt stores, ice cream stores, drug stores, restaurants serving liquor for on premises consumption, which may include live music and or karaoke, pottery stores, electronic stores, music stores, comedy clubs, sports bars, shoe stores, sneaker stores. In addition bakeries, cupcake stores, cookie stores which in the aggregate do not exceed 2,000 square feet shall be permitted

Case ID: 230702187

Notwithstanding anything contained in this Section 8.4 to the contrary, any premises in the Building which are now subject to a lease which would otherwise be restricted under this Section 8.4 may be used for the purposes expressly permitted or not prohibited by the terms of said lease during the term of said lease and/or any extensions or replacements thereof, provided that if Landlord's approval is required for such use and Landlord has the ability to withhold its consent, Landlord shall not grant such consent for a use which violates Tenant's exclusive without the prior written consent of Tenant.

8.5.   Assignment and Subletting: With regard to assignment and subletting:

(a)   Tenant shall have the right to assign or sublet the whole or any portion of the Premises with Landlord's prior written consent, not to be unreasonably withheld. Subject to the provisions of Section 8.6 hereof, Tenant shall remain primarily liable for the obligations of Tenant following any such assignment or subletting.

(b)   Within thirty (30) days of Tenant's request, to the extent Landlord has consented to such request, Landlord agrees to execute and deliver a non-disturbance and recognition agreement in favor of any subtenant of Tenant in the form annexed hereto as **Exhibit E** or such other form as may be reasonably acceptable to Tenant and such subtenant. Tenant and any subtenant shall have the right, without Landlord's consent, to mortgage its interest in this Lease and the Premises as well as its furniture, fixtures and equipment and personal property and Landlord shall cooperate with Tenant and any subtenant in connection with any such mortgage. Notwithstanding the foregoing, any such mortgage shall comply with the requirements of any mortgagee of Landlord.

8.6.   (a)(i).   If Tenant assigns this Lease to a Qualified Assignee (as defined below), then Tenant and (any guarantor of this Lease) shall be released and discharged from all liability and obligations under this Lease as of the date the Qualified Assignee assumes in writing the obligations of Tenant under this Lease accruing from and after the effective date of such assignment.  For purposes hereof, a "Qualified Assignee" shall mean an entity meeting either of the following financial criteria (the "Minimum Financial Criteria") as of the date of the assignment:  (i) such entity shall have a shareholder's equity of not less than $50,000,000 as shown on such entity's most recent annual audited financial statements, or (ii) such entity shall have a credit rating meeting or exceeding an Investment Grade Credit Rating (as defined below).  An assignee shall also be deemed to be a Qualified Assignee if the assignee deli ﹍﹍ a guaranty of the financial obligations of the tenant under this Lease (a "Guaranty") from an entity meeting or exceeding either of the Minimum Financial Criteria.  For purposes hereof "Investment Grade Credit Rating" shall mean a minimum credit rating of BB- by Standard and Poor's Rating Services or Baa3 by Moody's Investors Services or an equivalent minimum credit rating by the same or another rating agency, or any other credit rating which is generally considered to be "investment grade" by the financial community.

(a)(ii).   In addition to the foregoing, if at any time during the term, the entity then holding the tenant's interest in this Lease shall meet or exceed either of the Minimum Financial Criteria or delivers a Guaranty from an entity meeting or exceeding either of the Minimum Financial Criteria, then and in either such event, all prior holders

Case ID: 230702187

of the tenant's interest in this Lease and any prior guarantor of this Lease shall be released and discharged from all liability and obligations arising or accruing thereafter under its guaranty and under this Lease.

(b)(i).  If this Lease is assigned under circumstances which do not result in the release of Tenant and any guarantor of this Lease under Sections (a)(i) or (a)(ii) above, and if after the effective date of such assignment, (i) this Lease is terminated or cancelled for any reason under circumstances pursuant to which Tenant or any guarantor shall remain liable hereunder (including, without limitation, the default of such assignee or any future assignee), or (ii) the Lease shall be rejected by such assignee or any future assignee under any applicable federal or state bankruptcy or reorganization statute, Landlord shall promptly give written notice thereof to Fresh Formats, LLC (Fresh Formats, LLC or its successor being hereinafter referred to as the "Original Tenant"), together with a statement of any and all sums which at the time of such notice would be due under this Lease but for such termination or rejection, and of all other defaults (if any) under this Lease then known to Landlord.  The Original Tenant shall have the option, to be exercised by written notice to Landlord within sixty (60) days after receipt of such notice, to require Landlord to enter into a new lease (the "New Lease") of the demised premises with the Original Tenant or its designee (which shall be an affiliate of the Original Tenant).  If the Original Tenant notifies Landlord of the exercise of its option to enter into a New Lease hereunder, and if this Lease has not yet been terminated as a result of such default or rejection, Landlord agrees to terminate this Lease.

(b)(ii).  If the Original Tenant notifies Landlord of the exercise of its option to enter into a New Lease hereunder, Landlord shall, as promptly as possible after receipt of the Original Tenant's notice exercising such option, enter into such New Lease with the Original Tenant or its designee.  Such New Lease shall be effective on the date of termination of this Lease and shall be for the remainder of the term of this Lease, and at the rent and upon all agreements, terms, covenants and conditions of this Lease, including, without limitation, all applicable rights of renewal or extension.  Upon the effective date of such New Lease, the Original Tenant or its designee shall cure all unfulfilled monetary defaults of the tenant under this Lease and undertake to cure all non-monetary defaults relating to the condition of the demised premises or the tenant's repair or maintenance obligations hereunder that are susceptible of being performed by the Original Tenant or its designee.

In consideration of the agreement by the Original Tenant or its designee to cure all unfulfilled monetary defaults and to undertake to cure all non-monetary defaults in accordance with the immediately preceding paragraph, Landlord hereby assigns to the Original Tenant or its designee (as the case may be) all rights, claims, actions, and causes of action (the "Landlord Claims") that Landlord might have against any assignee of Tenant and/or any future assignee.  In confirmation of same, upon the written request of the Original Tenant or its designee made at any time on or after the effective date of the New Lease, Landlord will execute and deliver to the Original Tenant or its designee an appropriate agreement assigning or otherwise transferring to the Original Tenant or its designee all of the Landlord Claims; provided, however, that this clause shall be self-operative, and in the event that either the Original Tenant or its designee shall not request

Case ID: 230702187

said agreement, or if Landlord shall fail to deliver said agreement, no further instrument or document shall be necessary to effectuate said assignment.

(b)(iii).        Notwithstanding the foregoing, if Landlord delivers to the Original Tenant, together with Landlord's notice under Section 8.6(b)(i) above, a release of the Original Tenant, any guarantor of this Lease, and all subsequent holders of the lessee's interest in this Lease as to all liability under this Lease, as same may have been amended, the Original Tenant shall not have the foregoing option.


ARTICLE IX
Maintenance of Buildings

9.1.    Landlord's Maintenance Obligations.    During the term of this Lease, Landlord is responsible for necessary structural repairs to the exterior walls (excluding the exterior of and the frames surrounding all windows, doors, plate glass, store fronts and signs on such walls which shall be Tenants responsibility); necessary repairs to the roof, foundations, load bearing items, plumbing, pipes, and conduits located outside the Premises and/or in the Common Area and all necessary repairs to the Building Systems. "Building Systems" shall mean the mechanical, electrical, plumbing, sanitary, sprinkler, heating, ventilation and air conditioning, security, life-safety, elevator and other service systems or facilities of the Building up to the point of connection of localized distribution to the Premises (excluding, however, any supplemental HVAC systems installed by Tenant, sprinklers and the horizontal distribution systems within and servicing the Premises and by which mechanical, electrical, plumbing, sanitary, heating ventilating and air conditioning, security, life-safety and other service systems are distributed from the base Building risers, feeders, panelboards, etc. for provision of such services to the Premises). Landlord shall not be required to make any repairs where same were made necessary by any act or omission or negligence of Tenant, any subtenant or concessionaire, or their respective employees, agents, invitees, licensees, visitors or contractors, or by fire or other casualty or condemnation, except as provided below. Landlord shall be responsible for any repairs, alterations or replacements that shall be required at any time during the term of this Lease as a result of Landlord's failure to perform Landlord's Work. Landlord further agrees as its sole cost and expense to keep the Building in a safe and secure condition, and be responsible to enforce any and all guaranties or warranties as requested by Landlord affecting the Demised Premises.

9.2.    Tenant's Maintenance Obligations. Tenant shall promptly make and pay for all nonstructural repairs to the Premises and the fixtures, equipment and appurtenances therein (including all electrical, plumbing, heating, ventilation and air conditioning, sprinklers and life safety systems in and serving the Premises from the point of connection to the Building Systems) as and when needed to preserve the Premises in a good state of repair and operating order. All damage to the Building (excluding structural repairs which shall be performed by Landlord) or any portion thereof, or to any Tenant fixtures requiring repair caused by or resulting from any act, omission, neglect or improper conduct of Tenant shall be repaired at Tenant's cost and expense by Tenant. All Tenant repairs shall be of good quality utilizing new construction materials.

Case ID: 230702187

9.3.   Compliance with Law.  Should any repairs, modifications or alterations be required by reason of applicable law, same shall be made by Landlord at Landlord's cost and expense unless the need for such repairs, modifications or alterations shall result from Tenant's failure to perform its obligation under this Lease or shall result from Tenant's use of the Premises.

9.4.   Alterations.  Tenant may make interior alterations to the Premises and exterior non-structural alterations without the prior consent of Landlord, but Tenant shall not make any exterior or structural alterations without Landlord's prior approval, which approval shall not be unreasonably withheld or delayed; but all such alterations made by Tenant shall be made in conformity with applicable code and insurance requirements. Any and all alterations, additions, and improvements made by Tenant upon the Premises shall remain upon the Premises, and at the termination of this Lease, the Premises and such alterations, additions and improvements shall be surrendered in their then existing condition.  However, any trade fixtures, furniture, and equipment which may be installed by Tenant in the Premises prior to or during the term hereof at Tenant's cost and expense, may be removed by Tenant from the Premises.

ARTICLE X
Liability and Property Damage Insurance; Indemnities

10.1.   Landlord's Insurance

(a) Beginning with the commencement of Landlord's Work and thereafter continuously until the expiration of the term of this Lease, Landlord shall purchase and keep in force, or cause to be purchased and kept in force the following insurance:

(i) commercial general liability insurance, written on an occurrence and not a claims-made basis, containing provisions adequate to protect both Landlord and Tenant from and against claims for bodily injury, including death and personal injury (and with the Employee Exclusion deleted as to all such claims for personal injury), and claims for property damage, occurring upon the on or about the Common Areas of the Building (and/or occurring on the Premises due to the act, omissions or negligence of Landlord, or its employees, independent contractors, architects or engineers or due to Landlord's failure to company with, or default other breach of, the provisions of this Lease), such insurance having bodily injury and property damage combined limits of liability of not less than $5,000,000.00 per occurrence, which coverage may be provided by supplementing the commercial general liability policy with an umbrella liability policy, and such insurance shall include contractual liability insurance, non-owned automobile liability insurance and, if applicable, owned automobile liability insurance;

(ii)  Insurance upon the Building against loss or damage by a hazard insured under a so-called All Risk policy and such additional insurance as would customarily be carried by owners of retail centers in the same locale as the Building, and in all events including collapse, vandalism and malicious mischief, water damage and

Case ID: 230702187

sprinkler leakage, comprehensive boiler and machinery insurance, and flood and earthquake insurance, in amounts sufficient to prevent Landlord or Tenant from becoming a co-insurer within the terms of the applicable policies and in an amount equal to the actual replacement cost of the improvements upon the Building, including the value of all additions, alterations, replacements and repairs and thereto, by whomever made, as well as the machinery, equipment and their systems forming a part thereof. Said insurance shall also extend to all plate glass whether in the form of windows or in doors or otherwise forming a part of the improvements upon the Building including the Premises. The phrase "actual replacement cost" shall mean the actual replacement cost (excluding cost of excavations, foundations, footings, underground pipes, conduits, flues and drains) without diminution of such cost for depreciation or obsolescence. The foregoing policy shall contain an agreed-amount clause waiving coinsurance and Landlord shall annually update the amount of insurance coverage and arrange to continue the agreed-amount clause. The foregoing policy shall also contain, to the extent applicable, endorsements providing coverage for demolition and debris removal costs, increased cost of construction, and contingent liability from operation of building laws. Landlord may provide in any policies required by this subsection (ii) that the proceeds from such policies shall be payable to the lender having the first mortgage lien upon the Building, provided that said mortgage expressly provides that said proceeds shall be held in trust and released promptly by such lender as required of Landlord by this lease for repair and rebuilding as contemplated by Article XII of this Lease. Landlord shall promptly deliver to Tenant a true and correct copy of the recorded counterpart of said mortgage and renewals or extensions thereof in the event Landlord provides in any policy required by this subsection (ii) that the proceeds thereof be so payable to such lender. Any policy of insurance obtained by Landlord insuring improvements of or property on the Shopping Center shall contain a waiver of subrogation in favor in Tenant.

(b) 'Throughout the term, not less than thirty (30) days prior to the expiration dates of policies to be furnished hereunder, certificates of initial or renewal policies, as the case may be, shall be delivered to Tenant by Landlord. All insurance required of Landlord by this Article X shall be effected under valid and enforceable policies issued by insurers of recognized responsibility and which are rated A or A+ by Best's rating service (or a comparable rating by an equivalent service if Best's shall cease to publish such ratings).

(c) Nothing contained in this Article X shall prohibit Landlord from obtaining a policy or policies of blanket insurance which may cover other property of Landlord provided that: (i) any such blanket policy expressly allocates to the properties hereunder to be insured by Landlord not less than the amount of insurance required hereunder to be maintained by Landlord and (ii) such blanket policy shall not diminish the obligations of Landlord so that the proceeds from such policies shall be an amount no less than the amount of the proceeds that would be available if Landlord obtained the required insurance under policies separately insuring the risks which this lease requires Landlord to insure.

(d) From and after the Commencement Date, Tenant agrees to pay its pro-rata share of the reasonable annual costs incurred by Landlord in maintaining the

Case ID: 230702187

foregoing property insurance during the term hereof (but in no event shall Tenant be required to pay any portion of the premiums relating to any hazardous use of any premises within the Building causing higher premium charge than those generally applicable to general merchandise retail stores). The foregoing pro-rata share is computed on the same basis as Tenant's CAM Percentage set forth in Section 5.4 of this lease.

(e) The policies of insurance required by Section 10.1(a)(i) shall designate Tenant as an additional insured solely with respect to liability arising out of Landlord's operations and/or property owned by Landlord.

10.2.   Tenant's Insurance.

(a)   Beginning with the delivery of possession of the Premises to Tenant and thereafter continuously until the expiration of the term of this Lease, Tenant shall purchase and keep in force, or cause to be kept in force, with respect to Tenant's obligation in the Premises, commercial liability insurance in limits not less than those set forth in Section 1 of this Article X, under which Landlord shall be designated as an additional insured solely with respect to liability arising out of Tenant's operations and/or the Premises demised to Tenant, and Tenant shall furnish certificates evidencing such coverage to Landlord.

(b)   Tenant shall keep in effect on the Premises fire and extended coverage insurance with an insurance company satisfactory to Tenant for the full insurable value of Tenants improvements thereof.

Such policy described in (a) above shall name Landlord as the insured and shall be delivered to Landlord no later than the date that this Lease is fully executed by the parties hereto, together with a certificates of the insurance company or companies certifying that the premiums for said policy or policies have been fully paid and that the said policy or policies will not be canceled or suspended by the insurance company or companies without at least ten (10) consecutive calendar days prior written notice to landlord, and contain waivers of subrogation as against Landlord. All said policy or policies shall also contain a standard mortgagee endorsement in favor of the holder of any mortgage which may at any time be a lien upon the Larger Premises or any part thereof. Certificates evidencing renewals of such policy or policies shall also be delivered to Landlord at least ten (10) consecutive calendar days prior to the expiration date of any policy or policies then in force. If Tenant fails to supply and maintain such insurance, Landlord shall after written notice to Tenant and 15 days to cure, have the right to purchase such insurance or any part thereof, and the cost of such insurance shall become due and payable as Additional Rent.

10.3   Indemnities.

10.3.1   Tenant's Indemnity.   Tenant shall defend, hold harmless and indemnify Landlord, its officers, shareholders, members, trustees, principals, agents and employees (collectively "Landlord Indemnitees") from and against all liabilities, obligations,

-18-

Case ID: 230702187

damages, penalties, claims, costs, charges and expenses, including reasonable attorneys' fees, which may be imposed upon, incurred by, or asserted against any of the Landlord Indemnitees and arising out of (i) claims of physical injury to persons or damage to property occurring during the Term by reason of any accident or other occurrence at the Premises or the Outdoor Seating Area if used by Tenant, its agents, servants, employees, guests and/or invitees or that arise from the possession, use, occupancy, management, repair, maintenance or control by Tenant of the Premises or the Outdoor Seating Area if used by Tenant, or any portion thereof, except to the extent caused by the negligence or willful misconduct of Landlord or Landlord's agents or employees, (ii) the negligence or willful acts or omissions of Tenant, its agents, contractors, servants and/or employees, and (iii) the failure of Tenant to comply with the provisions of this Lease.  Tenant shall not be obligated to indemnify Landlord against loss, liability, damage, cost or expense arising out of a claim for which Tenant is released from liability pursuant to Section 10.4 below (or a claim arising out of the willful or negligent acts or omissions of Landlord or its agents, employees or contractors).

10.3.2 <u>Landlord's Indemnity</u>.  Landlord shall indemnify, defend and hold Tenant, its officers, shareholders, members, trustees, principals, agents and employees (collectively "Tenant's Indemnitees") harmless from and against all liabilities, obligations, damages, penalties, claims, costs, charges and expenses, including reasonable attorneys' fees, which may be imposed upon, incurred by, or asserted against any of the Tenant's Indemnitees and arising out of (i) the negligence or willful acts or omissions of Landlord, its agents, contractors, servants and/or employees, and (ii) the use of the Common Areas, to the extent occasioned by the negligence or willful act or omission of Landlord, except as shall be occasioned by the negligence or willful acts or omissions of Tenant, its agents, servants and/or employees (in which event Tenant shall indemnify and hold harmless Landlord to the extent of such negligence or willful act or omission), and (iii) the failure of Landlord to comply with the provisions of this Lease.  Landlord shall not be obligated to indemnify Tenant's Indemnitees against loss, liability, damage, cost or expense arising out of a claim for which Landlord is released from liability pursuant to Section 10.4 below (or a claim arising out of the willful or negligent acts or omissions of Tenant or its agents, employees or contractors).

10.4. <u>Waiver of Subrogation</u>.  Landlord and Tenant mutually agree that with respect to any loss which is covered by insurance then being, or required hereunder to be, carried by them, respectively, the one carrying or required hereunder to be carrying such insurance and suffering said loss releases the other of and from any and all claims with respect to such loss; and they further mutually agree that their respective insurance companies shall have not right of subrogation against the other on account thereof.  In the event that extra premium is payable by either party as a result of this provision, the other party shall reimburse the party paying such premium the amount of such extra premium.  If, at the written request of one party, this release and non-subrogation provision is waived, then the obligation of reimbursement shall cease for such period of time as such waiver shall be effective, but nothing contained in this Section shall be deemed to modify or otherwise affect releases elsewhere herein contained of either party for claims.

ARTICLE XI

-19-

Case ID: 230702187

<u>Mutual Self-Help</u>

11.1.  <u>Landlord's Right to Self-Help</u>.  Landlord and its designees shall have the right to enter upon the Premises at all reasonable hours upon not less than one (1) business day's notice to Tenant (except in the event of an emergency) for the purpose of inspecting or making repairs to the same.  If repairs are required to be made by Tenant pursuant to the terms hereof, Landlord shall notify Tenant to make such repairs, and if Tenant refuses or neglects to commence such repairs and complete the same with reasonable dispatch, after such notice, Landlord may (but shall not be required so to do) make or cause such repairs to be made.  If Landlord makes or causes such repairs to be made, Tenant agrees that it will pay to Landlord the reasonable cost thereof. Landlord agrees that any such repairs shall be made at such times and in such manner as will minimize interference with the business being conducted in the Premises.

11.2.  <u>Tenant's Right to Self-Help</u>.  If any repairs to the Premises or any maintenance, cleaning, or lighting of the Common Areas or any other obligation required by the terms hereof to be performed by Landlord are not performed by Landlord within seven (7) days after notice from Tenant (except in the event of an emergency), then Tenant shall have the right to perform such obligation of Landlord. If Tenant performs any such obligation of Landlord, Landlord agrees that it will pay to Tenant the reasonable cost thereof within 15 days of demand, or Tenant shall have the right to pursue all available remedies at law or in equity.

11.3.  <u>Emergencies</u>.  In the event of an emergency where something is required to be done forthwith in order to avoid damage to the Premises or lapse of insurance coverage or in the event that snow removal is not promptly accomplished, either party shall have the right of self-help consistent with Section 11.1 and 11.2 above, without the requirement of formal notice.  However, this right of self-help, as well as that set forth in Sections 11.1 and 11.2 hereof, shall be carefully and judiciously exercised by either party, it being understood and agreed that wherever possible, the party initially responsible for taking such action should be given sufficient opportunity so to do, in order to avoid any conflict with respect to whether or not self-help should have been availed of, or with respect to the reasonableness of the expenses incurred.

ARTICLE XII<br>Damage Clause

12.1 <u>Partial Damage</u>.  In case during the term hereof the Premises shall be partially damaged (as distinguished from "substantially damaged", as that term is hereinafter defined) by fire or other casualty, Landlord shall forthwith proceed to repair such damage and restore the Premises to substantially their condition at the time of such damage.

12.2  <u>Substantial Damage</u>.  In case during the term hereof the Premises shall be substantially damaged or destroyed by fire or other casualty, this Lease shall, except as hereinafter provided, remain in full force and effect, and Landlord shall, proceeding with all reasonable dispatch, repair such damage and restore the Premises to substantially their

-20-

Case ID: 230702187

condition at the time of such damage or destruction. The terms "substantially damaged" and "substantial damage" as used in this Article XII, shall have reference to damage of such a character as cannot reasonably be expected to be repaired or such that the Premises cannot be restored within one hundred eighty (180) days following the date on which restoration work is commenced.

12.3    Damage at End of Term. However, if the Premises shall be substantially damaged or destroyed by fire, windstorm, or otherwise, within the last three (3) years of the term of this Lease, either party shall have the right to terminate this Lease, provided that notice thereof is given to the other party not later than sixty (60) days after such damage or destruction. If said right of termination is exercised, this Lease and the term hereof shall cease and come to an end as of the date of such damage or destruction. However, if Landlord shall exercise said right of termination and at that time Tenant shall have the right to extend the term of this Lease, Tenant may render Landlord's notice of termination nugatory, provided that Tenant, within fifteen (15) days of receipt of the notice, shall elect to extend the term of this Lease.

12.4    Abatement of Rent. In the event that the provisions of Sections 12.1 or 12.2 shall become applicable, the Minimum Rent and all other charges payable hereunder shall be abated or reduced proportionately during any period in which, by reason of such damage or destruction, there is interference with the operation of business in the Premises, taking into account the extent of such interference; and if Tenant exercises its reasonable business judgment to discontinue the operation of business in the Premises, there shall be a full abatement of Minimum Rent and other charges payable hereunder until the first to occur of (i) the date on which Tenant shall reopen for business to the public in the Premises, or (ii) the expiration of a period of ninety (90) days after Landlord shall have completed such restoration work as Landlord is obligated to perform hereunder and the interference with the operation of business in the Premises has ceased. In the event of the termination of this Lease, pursuant to this Article XII, this Lease, and the term hereof, shall cease and come to an end as of the date of such damage or destruction. Any rent or other charges paid in advance by Tenant shall be promptly refunded by Landlord. It is further understood and agreed that, at Tenant's election, the term of this Lease shall be extended by up to the number of days, if any, during which business shall not have been conducted in the Premises by reason of such damage or destruction.

12.5.    Damage to Building or Parking Garage(s). In the event that any other portion of the Building or Parking Garage(s) is either partially or substantially damaged (irrespective of whether the Premises shall have been damaged or destroyed), Landlord shall proceed promptly to rebuild the same.

During any period of time that by reason of such damage or destruction, there is any interference with full access to the Premises, there shall be a fair and equitable abatement of the rent and other charges payable hereunder, taking into account the extent of such interference; and if Tenant exercises its reasonable business judgment to discontinue the operation of business in the Premises until such damage or destruction has been repaired, then there shall be a full abatement of rent and other charges payable hereunder until the first to occur of (i) the date on which Tenant shall reopen for business

Case ID: 230702187

to the public in the Premises, or (ii) the expiration of a period of ninety (90) days after Landlord shall have completed such restoration work as Landlord is obligated to perform hereunder and the interference with the operation of business in the Premises has ceased. It is further understood and agreed that, at Tenant's election, the term of this Lease shall be extended by up to the number of days, if any, during which business shall not have been conducted in the Premises by reason of such damage or destruction

12.6.   Tenant's Termination Right.   In any event, if Landlord shall not commence, in good faith, repair and restoration work with respect to "substantial damage" within sixty (60) days after any damage which Landlord is required to repair pursuant to the terms hereof, or if Landlord shall fail with all due diligence to continue with such repair and restoration work to completion, then Tenant shall have the right, in addition to all other rights and remedies available under this Lease or available at law or equity, to terminate this Lease by giving written notice of its election so to do to Landlord.

ARTICLE XIII
Eminent Domain

13.1.   Taking of the Premises.   If any portion of the Premises shall be taken by condemnation or right of eminent domain, Landlord shall immediately send written notice thereof to Tenant, and Tenant shall have the right to terminate this Lease by giving written notice to Landlord of it intention so to do not later than thirty (30) days after receipt by Tenant of such notice.   Should Tenant not exercise the right of termination aforesaid, Landlord shall promptly restore that which remains of the Premises to an architectural until as nearly like their condition prior to such taking, as shall be practicable.

13.2.   Reserved

13.3.   Reserved

13.4.   Awards.   Any and all awards for any such taking shall be shared in a fair and equitable manner between Landlord and Tenant to reflect the relative loss suffered by them respectively.

13.5.   Restoration.   In the event of the taking of any other portion of the Building (irrespective of whether any portion of the Premises shall have been so taken), Landlord shall proceed promptly:   (i) to restore that which may remain of any buildings or other improvements affected by the taking; and (ii) to restore the remaining property to a sightly condition.

13.6.   Rent Pro-Ration and Abatement.   In the event of a termination of this Lease following such taking, all rent and other charges shall be pro-rated up to the date of such termination, and Landlord shall promptly repay to Tenant any rent or other charges paid in advance.   In the event of a taking which does not result in the termination of this

Case ID: 230702187

Lease, the rent and all other charges payable hereunder shall be abated or reduced proportionately during any period in which, by reason of the performance of restoration work, there is interference with the operation of business in the Premises, taking into account the extent of such interference; and if Tenant exercises its reasonable business judgment to discontinue the operation of business in the Premises, there shall be a full abatement of Minimum Rent and all other charges payable hereunder until the first to occur of (1) the date on which Tenant shall reopen for business to the public in the Premises, or (ii) the expiration of a period of ninety (90) days after Landlord shall have completed such restoration work as Landlord is obligated to perform hereunder and the interference with the operation of the business of Tenant in the Premises has ceased. Further, Minimum Rent and all other charges payable hereunder shall be abated or reduced on a permanent basis in direct proportion to the amount of the Premises so taken. It is understood and agreed that, at Tenant's election, the term of this Lease shall be extended by up to the number of days, if any, during which business shall not have been conducted in the Premises by reason of such restoration work.

ARTICLE XIV
Representations and Warranties

14.1.   Landlord's Representations.  To induce Tenant to execute this Lease, and in consideration thereof, Landlord warrants and represents, and covenants and agrees as follows:

(a)  Landlord has good fee simple title to the entire Building] free and clear of all easements, cross easement agreements, restrictions, liens, encumbrances, leases and the like, except the mortgage now serviced by Wells Fargo Bank, NA (the "Bank") and those items listed on Exhibit D annexed hereto and made a part hereof.

(b)  There are no restrictions, exclusives or other legal impediments except those exclusives listed on Exhibit C annexed hereto and made a part hereof, either imposed by law (including applicable zoning and building ordinances) or by any instrument which would prevent (i) the use of the Building, including the Premises, in the manner contemplated by this Lease, (ii) the use of the parking facilities, access roads, and other Common Areas in the manner contemplated by this Lease, or (iii) the construction of the Premises in the manner contemplated by this Lease.  If at any time during the term of this Lease applicable law shall not permit the use of the Premises as permitted under this Lease, then Tenant, without waiving any other rights Tenant may have on account thereof, may terminate this Lease by giving Landlord notice thereof.   Tenant hereby agrees not to use the Premises in any manner so as to conflict with any exclusive use provisions set forth on Exhibit C.

(c)  The Premises now has, and throughout the term of this Lease (subject to Article XIII), will have access to all parking spaces available to the general public within the adjacent garage(s) as shown on the attached Exhibit. There shall be a reasonable number of spaces set aside (by appropriate signage) for the use of Tenant and its customers. Customers of Tenants using the garage shall be responsible for normal and customary charges imposed for parking, but shall be entitled to a discount of $1.00 per

Case ID: 230702187

visit by displaying to the attendant a receipt issued by Tenant showing the current date. Tenant shall also have the right to negotiate with the Landlord and/or the Parking Facilities operator for additional discounts any time during this Lease. Landlords consent or agreement to any such agreement will not be unreasonably withheld, conditioned or delayed.

(d)   The Building now complies and, throughout the term of this Lease, Landlord shall cause the Building to comply with, and shall indemnify Tenant with respect to violations (by other than Tenant) of, all environmental laws and regulations applicable to the Building and the uses made thereof, including, without limitation, laws and regulations relating to hazardous substances.

(e)   This Lease does not violate the provisions of any instrument heretofore executed; and the execution of this Lease has been duly and validly authorized on behalf of Landlord.

14.2.   Tenant's Representations.  To induce Tenant to execute this Lease, and in consideration thereof, Landlord warrants and represents, and covenants and agrees as follows:

(a)   This Lease does not violate the provisions of any instrument heretofore executed; and the execution of this Lease has been duly and validly authorized on behalf of Tenant.


ARTICLE XV
Remedies

15.1.   Tenant Default.

(a) Default. It shall be an "Event of Default" (a) if Tenant shall neglect or fail to perform or observe any of the covenants, terms, provisions or conditions contained in this Lease and on its part to be performed or observed within thirty (30) days after notice of default from Landlord, or such additional time as is reasonably required to correct any such default,(except for payment of Minimum Rent or any other payment payable hereunder, in which case, said period of notice shall be ten (10) days), or (b) if the leasehold estate hereby created shall be taken on execution or by other process of law, or (c) if Tenant shall be judicially declared bankrupt or insolvent according to law, or if any assignment shall be made of the property of Tenant for the benefit of creditors, or if a receiver, guardian, conservator, trustee in voluntary bankruptcy or other similar officer shall be appointed to take charge of all or any substantial part of Tenant's property by a court of competent jurisdiction, or if a petition shall be filed for the reorganization of Tenant under any provisions of the Bankruptcy Act now or hereafter enacted, and such proceeding is not dismissed within ninety (90) days after it is begun, or if Tenant shall file a petition for such reorganization, or for arrangements under any provisions of the

Case ID: 230702187

Bankruptcy Act now or hereafter enacted and providing a plan for a debtor to settle, satisfy or extend the time for the payment of debts.

(b) <u>Remedies</u>. If an Event of Default hereunder shall have occurred, Landlord may, at is option:

(i) Declare due and payable and to commence appropriate action for and to recover monthly as it becomes due and payable, all unpaid Minimum Rent for the unexpired period of the term of this Lease (and also all Additional Rent) as by the terms, covenants, conditions and provisions of this Lease payable, together with all reasonable legal fees, commissions and other necessary expenses incurred by Landlord in connection with the enforcement of any of Landlord's rights and remedies hereunder, provided, however, recoverable commissions payable for re-letting the Leased Premises shall only be those attributable to the then remaining term hereunder, with the Landlord using commercially reasonable efforts to relet the Premises and thereby mitigate its damages.

(ii) Distrain, collect or bring action for such Minimum Rent and Additional Rent calculated in accordance with the provisions hereof as being Rent in arrears, or enter judgment therefore in an amicable action as herein elsewhere provided for in case of Rent in arrears, or file a Proof of Claim in any bankruptcy or insolvency proceeding for such Minimum Rent and Additional Rent, or institute any other proceedings, whether similar or dissimilar to the foregoing, to enforce payment thereof, and/or

(iii) Terminate this Lease by giving written notice thereof to Tenant and, upon the giving of such notice, the term of this Lease and the estate hereby granted shall expire and terminate with the same force and effect as though the date of such notice was the date hereinbefore fixed for the expiration of the term hereof, and all rights of Tenant hereunder shall expire and terminate.

(iv) Exercise any other rights and remedies available to Landlord at law or in equity.

(c) If any Event of Default shall have occurred and is continuing, Landlord may, whether or not the term of this Lease has been terminated as herein provided, re-enter and repossess the Premises or any part thereof by summary proceedings, and Landlord shall thereafter have the right to remove all persons and property therefrom.

(d) At any time or from time to time after the repossession of the Premises or any part thereof, whether or not the term of this Lease shall have been terminated, Landlord shall use all reasonable efforts to re-let all or any part of the Premises for the account of Tenant for such term or terms (which may be greater or less than the period which would otherwise have constituted the balance of the term of this Lease) and on such conditions (which may include reasonable concessions or free rent)

Case ID: 230702187

and for such uses as Landlord, in its sole and absolute discretion, may determine, and Landlord may collect and receive any rent payable by reason of such re-letting. Any law, usage or custom to the contrary notwithstanding,

      (e)     No termination of the term of this Lease, by operation of law or otherwise, and no repossession of the Premises or any part thereof, or otherwise, and no re-letting of the Premises, or any part thereof, shall relieve Tenant of its liabilities and obligations hereunder, all of which shall survive such termination, repossession or re-letting.

      (f)     In the event that Tenant shall hold the Demised Premise after the expiration of the term hereof with the consent of the Landlord, express or implied, such holding over shall, in the absence of written agreement on the subject, be deemed to have created a tenancy from month to month terminable on thirty (30) days written notice by either party to the other, upon a monthly rental basis, and otherwise subject to all of the terms and provisions of this Lease. Such monthly rental shall be one-twelfth (1/12) of an amount equal to 125% of the total rental payable by Tenant to Landlord for the next preceding Lease year or during the next preceding twelve (12) month period, whichever is greater, including but not limited to minimum rent, and any additional rental provided by this Lease.

      15.2.  <u>Landlord Default</u>. In the event that Landlord is in default in the performance of any of its obligations under this Lease, which default materially and adversely affects Tenant's quiet enjoyment and use of any portion of the Premises which for purposes of this Section 15.2 include enforcement (including legal proceedings) of the Wawa Restriction as outlined in Section 2.2 above, and such default continues for a period of more than thirty (30) days after written notice from Tenant specifying such default, or if such default requires more than thirty (30) days to remedy and it continues, after such notice, beyond the time reasonably necessary to cure (including such time to obtain injunctive relief), Tenant shall have the rights to all remedies available hereunder or available at law or in equity. Tenant shall also (as liquidated damages herein agreed to by Landlord, and not as a penalty) upon thirty (30) days written notice, and only in the case of a breach of the Wawa Restriction, have the right to reduce Minimum Rent payable by 50% until such time as Landlord is able to enforce the Wawa Restriction as written.

      No owner of any interest in the Building, whether or not named herein, shall have any liability hereunder after it ceases to hold such interest, except for such obligations which may have theretofore accrued. If Landlord is in breach or default with respect to Landlord's obligations under this Lease or otherwise, Tenant shall look solely to the equity of Landlord in the Building for the satisfaction of Tenant's remedies. It is expressly understood and agreed that Landlord's liability under the terms, covenants, conditions, warranties and obligations of this Lease shall in no event exceed Landlord's equity interest in the Building. The obligations of Landlord under this Lease are not intended to and shall not be personally binding on, nor shall any resort be had to the private properties of, any of Landlord's (or, as the case may be, its property manager's) partners, directors, officers, shareholders, employees, agents or beneficiaries.

Case ID: 230702187

ARTICLE XVI
Miscellaneous Provisions

16.1.   Waiver.  Failure on the part of either party to complain of any action or non-action on the part of the other, no matter how long the same may continue, shall never be deemed to be a waiver by such party of any of its rights hereunder.  Further, it is covenanted and agreed that no waiver at any time of any of the provisions hereof by either party shall be construed as a waiver of any of the other provisions hereof, and that a waiver at any time of any of the provisions hereof shall not be construed as a waiver at any subsequent time of the same provisions.  The consent or approval to or of any action by either party requiring such consent or approval shall not be deemed to waive or render unnecessary such consent or approval to or of any subsequent similar act by such party.

16.2.   Covenant of Quiet Enjoyment.  Tenant, subject to the terms and provisions of this Lease, on payment of the rent and observing, keeping and performing all of the terms and provisions of this Lease on its part to be observed, kept and performed, shall lawfully, peaceably and quietly have, hold, occupy, and enjoy the Premises during the term hereof without hindrance or ejection by an person.

16.3.   Estoppels.  Upon the reasonable request of the other party, at any time or from time to time, Landlord and Tenant each agree to execute, acknowledge and deliver to the other, within fifteen (15) days after receipt of written request, a written instrument, duly executed and which shall be binding on the party executing such instrument and may be relied upon by the other party: (a) certifying that this Lease is in full force and effect and, if this Lease has been amended or modified, listing any amendments or modifications hereof, (b) specifying the dates to which the Minimum Rent and other regular charges payable hereunder have been paid, (c) stating whether or not, to the knowledge of the party executing such instrument, the other party hereto is in default (and if so, specifying the nature of such default), and (d) certifying as to any other factual information, reasonably and customarily included in any such instrument.

16.4.   Notice to Mortgagee.  After receiving written notice from any person, firm, or other entity, that it holds a mortgage (which term shall include a deed of trust) which includes as part of the mortgaged premises the Premises, Tenant shall, so long as such mortgage is outstanding, be required to give to such holder the same notice as is required to be given to Landlord under the terms of this Lease, but such notice may be given by Tenant to Landlord and such holder concurrently.  It is further agreed that such holder shall have the same opportunity to cure any default, and the same time within which to effect such curing, as is available to Landlord, and if necessary, to cure such a default, such holder shall have access to the Premises.

16.5.   Mechanic's Liens.  Tenant agrees promptly to discharge (either by payment or by filing of the necessary bond, or otherwise) any mechanic's, materialmen's, or other lien against and Premises and/or Landlord's interest therein, which liens may arise out of any payment due for, or purported to be due for, any labor, services,

Case ID: 230702187

materials, supplies, or equipment alleged to have been furnished to or for Tenant in, upon or about the Premises.

16.6.   Invalidity of Particular Provisions.  If any term or provision of this Lease, or the application thereof to any person or circumstances, shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

16.7.   Provisions Binding, Etc.  Except as herein otherwise expressly provided, the terms hereof shall be binding upon and shall inure to the benefit of the successors and assigns, respectively, of Landlord and Tenant. The term "Landlord" as used in this Lease means only the owner or mortgagee in possession for the time being of the building in which the Premises are located or the owner of a leasehold interest in said building and/or the land thereunder (or the managing agent of any such owner or mortgagee) so that in the event of sale of said building or leasehold interest or an assignment of this Lease, or a demise of said building and/or land, Landlord shall be and hereby is entirely freed and relieved of all obligations of Landlord subsequently accruing. It is specifically understood and agreed that there shall be no personal liability of Landlord (nor Landlord's agent, if any) in respect to any of the covenants, conditions or provisions of this Lease. In the event of a breach or default by Landlord of any of its obligations under this Lease, Tenant shall look solely to the equity of the Landlord in the Building for the satisfaction of Tenant's remedies.

It is understood that each of the covenants, promises and agreements made by Landlord in this lease, whether affirmative or negative in nature, shall run with the land of the Building for the benefit of the Premises and shall be binding upon Landlord and each successive owner during its ownership of any portion of the balances of the Building and upon each person having any interest therein derived through the owner thereof.

16.8.   Governing Law.   This Lease shall be governed exclusively by the provisions hereof, and by the laws of the state where the Building is located as the same may from time to time exist.

16.9.   Recording.  Tenant agrees not to record this Lease, but Landlord agrees to execute and record a recordable short form lease complying with applicable laws, and reasonably satisfactory to the attorneys for Landlord and Tenant. In no event shall such document set forth the rental or other charges payable by Tenant under this Lease; and any such document shall expressly state that it is executed pursuant to the provisions contained in this Lease, and is not intended to vary the terms and conditions of this Lease.

16.10. Notices.   Except as provided elsewhere in this Lease, all notices required hereunder shall be in writing and shall be sent by certified or registered mail, return receipt requested, postage prepaid, or by a nationally recognized overnight courier service that requires proof of receipt.  Any written notice shall be deemed to have been given when received, and shall be effective when given, except as specifically otherwise

Case ID: 230702187

provided in this Lease.  Any notice hereunder shall be deemed to have been received on the delivery date endorsed by the Postal Service or the overnight courier service on the return receipt, except that any notice which is correctly addressed but which is returned by the Postal Service or the overnight courier service as undeliverable shall be deemed to have been received on the earliest date on which the Postal Service or the overnight courier service attempted delivery as indicated on the return receipt.  Notices intended for Landlord shall be mailed or sent to Landlord at 530 South 2nd Street, Suite 110, Philadelphia, PA 19147, Attention: Eric Blumenfeld, with a copy, mailed in the same manner to 530 South 2nd Street, Suite 110, Philadelphia, PA 19147, Attention: Michael Stutman, Esquire.  Notices intended for Tenant shall be mailed to Tenant, 780 Dedham Street, Suite 600, Canton, MA 02021, with a copy, mailed in the same manner to Tenant, Attention: Vice President, Real Estate Law, 1385 Hancock Street, Quincy, Massachusetts 02169.  In no event shall notices to Tenant ever be sent to the Premises (unless Tenant expressly agrees otherwise), and any notices to Tenant that are delivered to the demised premises shall be of no force or effect.  Either party, by written notice to the other, may designate other (and additional) addresses to which notices for the designating party shall be sent.  Notwithstanding any assignment or subletting, copies of any notice to the holder of Tenant's interest hereunder alleging default shall always be sent to the Tenant named herein, and Landlord shall always accept payment or performance from the Tenant named herein.  Each party agrees that notices to such party ("Receiving Party") may be given to the Receiving Party by the attorney for the other party ("Sending Party") acting on behalf of the Sending Party.

16.11.  Paragraph Headings.  The paragraph headings throughout this instrument are for convenience and reference only, and the words contained therein shall in no way be held to explain, modify, amplify, or aid in the interpretation, construction, or meaning of the provisions of this Lease.

16.12.  Landlord and Tenant.  It is understood and agreed that Landlord shall, in no event, be construed or held to be a partner or associate of Tenant in the conduct of Tenant's business; but it is understood and agreed that the relationship is, and at all times shall remain, that of landlord and tenant.

16.13.  Signs.  Landlord hereby grants to Tenant, its successors and assigns, the right at Tenant's sole cost and expense to install, maintain, repair and replace on the exterior of the Premises its standard signs or other advertising devices so long as they comply with Landlords signage specifications for the Building (requiring Landlord's consent, not to be unreasonably withheld) and all applicable laws and regulations. Tenant, with respect to the Premises, and Landlord, with respect to the Building, agree that no sign will be installed on the roof of the Building. Tenant agrees to maintain all signs that it shall install in good repair, order and condition.

16.14.  Transmittal of Lease.  This Lease is transmitted for examination only and does not constitute an offer to lease, and this Lease shall become effective only upon the execution and unconditional delivery thereof by both parties hereto.

Case ID: 230702187

16.15. <u>Force Majeure</u>.   Any prevention, delay or stoppage due to strikes, lockouts, labor disputes, acts of God, inability to obtain labor or materials or reasonable substitutes therefor, enemy or hostile governmental action, riot, civil commotion, fire or other casualty, and other causes beyond the reasonable control of the party obligated to perform, excluding the financial inability of such party to perform (any such causes or events to be referred to herein as a "Force Majeure"), shall excuse the performance by such party for a period equal to any such prevention, delay or stoppage; provided, however, the foregoing shall not be applicable to (i) Tenant's obligation to pay rent, additional rent and any other sums or charges pursuant to this lease (except as otherwise provided in Articles XII and XIII hereof), (ii) Landlord's obligations with respect to the completion of Landlord's Work and delivery of possession of the Premises to Tenant and (iii) Landlord's restoration and repair obligations set forth in Article XII and XIII hereof.

16.16. <u>Brokers</u>. Tenant hereby represents and warrants to Landlord that Tenant has dealt with no broker in connection with this Lease except for CBRE/FAMECO ("Broker"), whose commission shall be paid by Landlord pursuant to a separate agreement between Landlord and Broker.  Landlord agrees that Landlord shall indemnify and hold Tenant harmless from and against any and all claims for brokerage commissions or finder's fees which may be asserted on account of this Lease, including, without limitation, attorneys' fees and any other costs of defending the same. Tenant agrees that Tenant shall indemnify and hold Landlord harmless from and against any and all claims for brokerage commissions or finder's fees (other than to Broker) which may be asserted on account of this Lease, including, without limitation, attorneys' fees and any other costs of defending the same.

16.17. <u>Non-Disturbance</u>.   Prior to, concurrently with, or within thirty (30) days following the execution and delivery of this lease, Landlord shall cause to be delivered to Tenant a so-called non-disturbance agreement from the Bank in form satisfactory to Tenant, providing, in substance, that in the event of foreclosure of the mortgage now held by the Bank, the Bank and its successors in interest will recognize all of the rights of Tenant hereunder (including, without limitation, permission for insurance proceeds and eminent domain awards to be applied as required hereunder), with the same force and effect as though this lease and been executed, delivered, and recorded prior to the execution, delivery and recording of said mortgage.

16.18. <u>Enforcement and Attorneys' Fees</u>.   In any proceeding or controversy associated with or arising out of this Lease or a claimed or actual breach hereof, the prevailing party shall be entitled to recover from the other party as a part of the prevailing party's costs, such party's actual reasonable attorneys', appraiser's and other professionals' fees and court costs.  The award for legal expenses shall not be computed in accordance with any court schedule, but shall be as necessary to full reimburse all attorneys' and other professionals' fees and other expenses actually incurred in good faith, regardless of the size of the judgment, it being the intention of the parties to fully compensate the prevailing party for all the attorneys' and other professionals' fees and other expenses paid in good faith.

Case ID: 230702187

16.19  <u>Lender Approval</u>.   If the lender holding the mortgage on the Building ("Lender") has not provided its consent to this Lease within fifteen (15) calender days of the date of full execution of this Lease, this Lease shall be null, void and of no effect.

[SIGNATURES APPEAR ON NEXT PAGE]

Case ID: 230702187

WITNESS THE EXECUTION HEREOF, under seal, in any number of counterpart copies, each of which counterpart copies shall be deemed an original for all purposes, as of the day and year first above written.

Landlord:
STOBBA ASSOCIATES, L.P.

By: EB Stobba GP, Inc.
    Its general partner

By: _____
    Eric Blumenfeld, President

Tenant:
FRESH FORMATS, LLC

By: _____
Its
Hereunto duly authorized

-32-

Case ID: 230702187

Exhibit A-1
SITE PLAN

Case ID: 230702187



Ex A-1

Case ID: 230702187

Exhibit A-2
## METES AND BOUNDS DESCRIPTION OF LAND

STOBBA ASSOCIATES LP PARCEL:

ALL THAT CERTAIN TRACT OF LAND SITUATE IN THE FIFTH WARD, CITY OF PHILADELPHIA, COUNTY
OF PHILADELPHIA, COMMONWEALTH OF PENNSYLVANIA; DESCRIBED ACCORDING TO A PARCEL PLAN
MADE FOR ABBOTTS PLACE BY PENNONI ASSOCIATES, INC., CONSULTING ENGINEERS, DATED
12/4/1981 AND LAST REVISED 9/21/1983, TO WIT:-

BEGINNING AT A POINT, THE INTERSECTION OF THE WESTERLY LINE OF SECOND STREET (130 FEET
WIDE) WITH THE NORTHERLY LINE OF SOUTH STREET, 51.00 FEET WIDE; THENCE (1) ALONG SAID
NORTHERLY LINE OF SOUTH STREET, IN A WESTERLY DIRECTION, A DISTANCE OF 460.292 FEET,
DISTRICT STANDARD, (461.06 FEET, U.S. MEASURE) TO A POINT OF INTERSECTION WITH THE
EASTERLY LINE OF THIRD STREET, 50.00 FEET WIDE; THENCE (2) ALONG SAID EASTERLY LINE OF
THIRD STREET, IN A NORTHERLY DIRECTION, A DISTANCE OF 126.000 FEET, DISTRICT STANDARD,
(126.210 FEET, U.S. MEASURE) TO A POINT IN SAME; THENCE (3) LEAVING SAID LINE OF THIRD
STREET, IN AN EASTERLY DIRECTION, PERPENDICULAR TO THIRD STREET, ALONG THE NORTH SIDE
OF A PROPOSED 12 INCH RETAINING WALL, A DISTANCE OF 337.238 FEET, DISTRICT STANDARD,
(337.801 FEET, U.S. MEASURE) TO A POINT; THENCE (4) IN A NORTHERLY DIRECTION, BY AN
INTERIOR ANGLE OF 270 DEGREES 00 MINUTES, 00 SECONDS TO THE LAST MENTIONED COURSE AND
PARALLEL TO SECOND STREET, ALONG THE WEST SIDE OF PROPOSED 12 INCHES RETAINING WALL, A
DISTANCE OF 198.887 FEET, DISTRICT STANDARD, (199.219 FEET, U.S. MEASURE) TO A POINT IN THE
SOUTHERLY LINE OF LOMBARD STREET (50.00 FEET WIDE); THENCE (5) ALONG SAID SOUTHERLY
LINE OF LOMBARD STREET, IN AN EASTERLY DIRECTION, A DISTANCE OF 123.051 FEET, DISTRICT
STANDARD, (123.256 FEET, U.S. MEASURE) TO A POINT OF INTERSECTION WITH THE WESTERLY LINE
OF SECOND STREET, AFORESAID; THENCE (6) ALONG SAID WESTERLY LINE OF SECOND STREET, IN A
SOUTHERLY DIRECTION, A DISTANCE OF 322.500 FEET, DISTRICT STANDARD, (323.040 FEET, U.S.
MEASURE) TO THE FIRST MENTIONED POINT AND PLACE OF BEGINNING.

CONTAINING 1.8784 ACRES OF LAND (DISTRICT STANDARD).

Case ID: 230702187

(Excludes air rights above)

Case ID: 230702187

Exhibit B
LANDLORD 'S WORK

See Attached

Case ID: 230702187

Fresh Formats LLC
2nd and South, Abbott Sq., Philadelphia, PA
Date: March 4, 2016

LANDLORD'S SCOPE OF WORK

Fresh Formats, LLC – Exhibit B

THE LANDLORD SHALL PROVIDE THE BUILDING, THE PREMISES AND LANDLORD'S RESIDENTIAL DEVELOPMENT PROJECT COMPLETED TO THE EXTENT DEFINED BELOW:

1.   PERMITS AND APPROVALS

Landlord shall acquire permits and approvals for all work described in this Exhibit B (collectively the "Landlord's Work"). Landlord will deliver the Premises in Compliance with all applicable codes and ordinances. .

2.   CONDITION AND DEMISING OF PREMISES

Landlord shall deliver the Premises (including the present Super Cut's space) to Tenant vacant and free and clear of all leases, subleases, tenancies and rights of occupants and in a broom clean condition, free of all materials, debris, fixtures, and personal property.

Landlord shall construct a new fire rated demising partition consisting of one or more walls which shall separate the Premises from the adjacent rentable space on the first floor and mezzanine levels (the "Demising Walls"), as shown on the fixture plan identified as F-1 dated 02/19/16 ( rev 11 dated 03/02/16) prepared by Scott Griffin attached hereto as page 1 of Exhibit B-1 and made a part hereof). The sides of the Demising Walls within the Premises shall be left open for future Tenant electrical work.

2.1   ADDITIONAL CONDITIONS OF DEMISED PREMISES

a.   Broom clean with all nonfunctional MEP systems removed and/or terminated back to their origin.
b.   Remove all non-bearing walls (except walls that define the perimeter of the demised space), floor systems (including computer flooring and/or raised floor structures), door frames, drywall and acoustical ceilings, stairs, recessed floor materials, floor finishes, supports, hangers and all fasteners used to support such systems. All supports, hangers and fasteners to be cut and/or removed with holes patched. Any demolition of mezzanine space will be Tenant's responsibility as shown on plan LD 1.0 dated 02/03/16 by JKRP which is attached hereto and incorporated herein as page 2 of Exhibit B-1
c.   Separation of utilities, specifically the adjacent space operated by Chef's Market; which will be open and operating throughout the duration of the Tenant's work. No cross connection of utilities between Chef's market or other building tenants can remain in the tenants demised premises.
d.   Removal of existing ramp currently used by residential tenants as shown on exhibit LD 1.0 dated 2/3/16 and prepared by JKRP Architects and attached hereto as page 2 of Exhibit B-1.
e.   Removal of existing drop ceiling and insulation in the garage level below the demised premises.
f.   Any work associated with the proposed Landlord's Residential project above the demised premises, that will impact the Fresh Format Demised space, shall be

1

Case ID: 230702187

Fresh Formats LLC
2nd and South, Abbott Sq., Philadelphia, PA
Date: March 4, 2016

completed prior to the delivery of possession.  This work includes overhead plumbing, structural modifications to the base building and any and all utilities that may run through Tenants space all of which is shown on drawing LD 1.0 dated 02/03/16 by JKRP which is attached hereto and incorporated herein as page 2 of Exhibit B-1.

3.      RECEIVING/LOADING AREA

Tenant shall have the exclusive right to use "Loading Area" in the location shown on the fixture plan identified as LOD dated 02/19/16 ( rev 11 dated 03/02/16) prepared by Scott Griffin attached hereto as page 7 of  Exhibit B-1 and made a part hereof for receiving deliveries to the Premises.

4.      TRASH AREA

Tenant shall provide area for trash storage within their demised space.

5.      SERVICE CORRIDORS and  DOORS

Landlord shall provide access to Tenant from the exterior of the Building to the Premises through service corridors located on the ground floor and mezzanine levels with a minimum width of 3 ½ feet (the "Service Corridors") in the locations shown on fixture plan identified as F-1 dated 02/19/16 ( rev 11 dated 03/02/16) prepared by Scott Griffin attached hereto as a page 1 of Exhibit B-1 and made a part hereof.  LL shall infill all interior masonry walls where corridor doors are removed. Landlord shall also construct an exterior door for access to the service corridor on the first floor of the Premises (the "Service Corridor Door"), in the location shown on the fixture plan identified as F-1 dated 02/19/16 ( rev 11 dated 03/02/16) prepared by Scott Griffin attached hereto as page 1 of Exhibit B-1 and made a part hereof .

6.      PARKING GARAGE/ /ELEVATOR/ELEVATOR LOBBIES

The lower level parking facilities, elevator lobby and elevator cab shall be free of all trash and debris and professionally steam -cleaned to remove obnoxious odors.  Painting upgrades shall be completed to these areas including removal of graffiti. Lighting in these areas shall be upgraded to a minimum three (3) foot candle to ensure customer safety.

7.      EQUIPMENT AREA (fenced)

Tenant shall have the exclusive use of a portion of the lower parking deck for the installation by Tenant of a fenced area for new mechanical, plumbing, and refrigeration equipment (including grease traps) (the "Equipment Room") in the location shown on the drawing entitled LE 1.0, dated 2/3/16 and prepared by JKRP Architects and attached  as page 3 of Exhibit B-1.

8.      UTILITIES

8.1      WATER SERVICE

2

Case ID: 230702187

Fresh Formats LLC
2nd and South, Abbott Sq., Philadelphia, PA
Date: March 4, 2016

Landlord shall provide a 2" waterline stubbed into the Premises and terminated with a valve at a mutually agreed to location. Landlord will also provide a backflow preventer as required by applicable codes.

8.2    SANITARY SERVICE

Landlord shall provide new sanitary systems for Landlord's Residential Development Project (as defined below) and replace the existing sanitary systems below the existing upper parking deck. Landlord shall install new mutually acceptable pans for all horizontal sanitary and storm piping. The locations of new vertical plumbing lines through Premises to be in the locations designated by Landlord apartments above and disclosed on the Residential Project Work described in Paragraph 9 below

Tenant's sanitary lines and grease traps shall be located below the first floor. The locations of the sanitary lines are based on the tenant's fixture layout and take place at several locations throughout the demised premises. These lines shall be connected to the Landlord's existing sanitary system below the garage floor. Landlord shall provide all vents required for tenant's sanitary lines. Such vents shall extend up through the roof and vent to the atmosphere. Locations of such existing vents shall be identified by the Landlord on a drawing or plan delivered to Tenant and coordinated with the Tenant's plumbing engineer. Initial locations are as shown on LP.1 and LP.2 prepared by JKRP and attached as pages 4 and 5 of Exhibit B-1.

8.3    GAS SERVICE

Landlord shall bring new gas service to the Demising Wall in the location depicted on LP .2 dated 2/3/16 and prepared by JKRP Architects and attached as page 5 of Exhibit B-1. Gas Service shall be metered by the utility company. Metering, service and connections to the Premises will be responsibility of Landlord. Landlord shall furnish and install a gas booster (Spencer model GL 0325-1/2-R) to provide the required gas pressure needed for Tenant's operation of gas fired equipment as depicted on exhibit LP .2 dated 2/3/16 and prepared by JKRP Architects

8.4    HVAC

All HVAC work shall be provided and installed by the Tenant including all HVAC systems, refrigeration systems, exhaust systems, and make-up air systems. The HVAC systems for the tenant shall be connected to the building cooling tower loop.

Landlord has identified to Tenant where (as depicted on page 6 of Exhibit B-1 being LP3 dated 03/07/2016 and prepared by JKRP Architects) the pipe connections to the Building's water source heat pump loop can be made to support the HVAC cooling capacity required for the Tenant's demised space. Tenant shall connect to LL's existing condenser water system. Tenant's total cooling capacity shall be 50 tons based on standard operating conditions.

8.5    ELECTRICAL

Landlord shall provide metered electrical service to the demised Premises. Service to originate from existing mezzanine service corridor re-using existing 800 amp bus duct

Case ID: 230702187

Fresh Formats LLC
2nd and South, Abbott Sq., Philadelphia, PA
Date: March 4, 2016

switch with conduit and feeders into tenant space to Landlord provided panel board "DPH" -- 800 amp - 277/480v with required circuits into Tenants electrical room located in the mezzanine area of the demised premises, shown on fixture plan identified as F-1 dated 02/19/16 ( rev 11 dated 03/02/16) prepared by Scott Griffin attached hereto as page 1 of Exhibit B-1 and made a part hereof.

8.6     FIRE ALARM SYSTEM

Any required reprogramming of existing building system to accommodate Tenant's fire alarm system (which system shall be functionally to Landlord's system) shall be provided by Landlord.

8.7     SPRINKLER:

Landlord shall provide a code compliant sprinkler system throughout the Tenants demised areas.  Tenant will be responsible to modify the existing sprinkler system to accommodate Tenants room layouts and added ceilings.

7.8     TELEPHONE/INTERNET

Landlord to provide 2- 4" empty conduits to the demised space from the buildings demark location to a location in Tenants data room located in the mezzanine area of the demised premises, shown on fixture plan identified as F-1 dated 02/19/16 ( rev 11 dated 03/02/16) prepared by Scott Griffin attached hereto as page 1 of Exhibit B-1 and made a part hereof.

9     LANDLORD'S RESIDENTIAL DEVELOPMENT PROJECT

Landlord intends to construct a residential development project in the upper parking deck located above the Premises (the "Landlord's Residential Development Project").  All work relating to the Landlord's Residential Development Project that affects the interior or exterior of the Premises (the "Residential Project Work") shall be completed prior to delivery of possession of the Premises to Tenant including, without limitation: the Sanitary Service Work (as described in Section 7.2 above), all other utility work and the façade alterations above the Premises (including removal of all scaffolding).  Landlord shall provide Tenant with a construction schedule for the Residential Project Work within two (2) weeks of Lease execution.

Case ID: 230702187

Exhibit B-1

TENANTS' WORK

See preliminary fixture Plan attached hereto

As outlined in Section 7.2 of the Lease to be supplemented by amendment to Lease to add formal Tenant's work exhibit when prepared and approved as required by the Lease.

Case ID: 230702187



B-1 (PG 1)

Case ID: 230702187



B-1 (P&2)

Case ID: 230702187



EXB-1   (PC 3)

Case ID: 230702187



Ex B-1 (Pg-4)

Case ID: 230702187



Case ID: 230702187



Ex B-1 (Pg 6)

Case ID: 230702187



Ex B-1 (pg 7

Case ID: 230702187

Exhibit C
## LIST OF EXCLUSIVES OR USE RESTRICTIONS

During the term of the Wawa lease, it is expressly agreed that the premises subject to the Fresh Fromats Lease (or any expansion or modification thereof) shall not be used primarily as a convenience food store or coffee store. The term "convenience food store" means any store generally recognized by the retail food industry as being a convenience food store, including but not limited to, the type of store operated by Tenant, Sheetz, 7-Eleven, Turkey Hill, Hess, Speedway, Cumberland Farms, QuikCheck, Royal Farms, Circle K, Exxon-Mobil (On the Run), Race Trac, Gate, Thorntons, Hess Express, Murphy USA, Murphy Express or Sunoco A-Plus. The term "coffee store" means a store primarily engaged in the sale of coffee and related coffee drinks, including without limitation, Starbucks, Seattle's Best, Einstein's, Caribou Café, Bucks County Coffee or Barnie's Coffee and Tea Company. Nothing shall prohibit the sale of coffee beverages provided the premises will not be a "coffee store" or serve nationally branded coffee such as Starbuck's and Dunkin Donuts.

Case ID: 230702187

Exhibit D
TITLE EXCEPTIONS

Case ID: 230702187

*First American Title Insurance Company*

Commitment No.  NCS-760457-PHIL

### SCHEDULE B - SECTION I (CONT.)

**UPON SATISFACTORY EVIDENCE OF DISCHARGE, SATISFACTION OR COMPLIANCE WITH THE FOLLOWING ITEMS AFFECTING TITLE TO THE SUBJECT PREMISES, SUCH ITEMS WILL BE REMOVED AND THE POLICY WILL BE ISSUED WITHOUT EXCEPTION THEREFORE:**

1.  Any lien, or right to a lien, for services, labor or material heretofore or hereafter furnished, imposed by law and not shown by the public records.  (may be removed by affidavit)

2.  Proof of identity, legal age, competency and marital status of all parties to the transaction.  Photo identification required to be presented.  (e.g. Drivers License/Passport)

3.  Funds must be in form of wire, cashiers (bank) check or certified check and made payable to First American Title Insurance Company.  Wires instructions sent on request.

4.  Powers of Attorney (POA):  All parties intending to use a Power of Attorney to execute Deed, Mortgage or other recordable instrument must supply copy of POA in advance for review and approval and original POA for recording.

5.  Proof that there are no Overdue support obligations of record with the Domestic Relations Section of the parties to this transaction, up through the date of recording of the instruments to be insured.

6.  Proof that no sewers have been installed or have been ordered to be installed on the insured premises. (may be removed by affidavit)

7.  Tax receipts for City or Township, County and School Taxes in the years 2012 through 2014 inclusive to be produced and filed with the Company.

8.  City or Township, County and School Taxes for current year (if paid, produce receipts)
    Tax Parcel:  883407500                           Assessment: $30,888,000.00

9.  Receipts for Water, Sewer Rents and Gas service (City of Philadelphia) for the current year.

10.  MECHANICS LIENS AND MUNICIPAL CLAIMS:  None

11.  JUDGMENTS:  None

12.  BANKRUPTCIES:  A search of Stobba Associates, L.P. conducted in the US Eastern, Middle and Western Districts of Pennsylvania, finds the following: None

13.  MORTGAGES: (1)

     $24,000,000.00 (Open-End)

     Stobba Associates, L.P. and Stobba Residential Associates, L.P. to Cantor Commercial Real Estate Lending, L.P., dated 11/18/2013 and recorded 11/26/2013 in Document No. 52724292.

Case ID: 230702187

*First American Title Insurance Company*

Commitment No.  NCS-760457-PHIL

Assignment of Leases and Rents recorded 11/26/2013 In Document No. 52724293.

Subordination, Non-Disturbance and Attornment Agreement recorded 11/26/2013 In Document No. 52724295. (Thrift Drug, Inc.)

Subordination, Non-Disturbance and Attornment Agreement recorded 11/26/2013 In Document No. 52724296. (Abbotts Square Fancy Foods, LLC)

Subordination, Non-Disturbance and Attornment Agreement recorded 11/26/2013 In Document No. 52724297. (Citibank, N.A.)

Subordination, Non-Disturbance and Attornment Agreement recorded 11/26/2013 In Document No. 52724298. (TD Bank, N.A.)

Subordination, Non-Disturbance and Attornment Agreement recorded 11/26/2013 In Document No. 52724299. (WaWa, Inc.)

14.   SECURED TRANSACTIONS:

a.   Recorder of Deeds:  (1)

Stobba Associates, L.P. and Stobba Residential Associates, L.P. (Debtor) to Cantor Commercial Real Estate Lending, L.P. (Secured Party), filed 11/26/2013 at Document No. 52724294.

b.   Secretary of State:  Not Searched

15.   Furnish copy of the following:

(a)   The limited partnership agreement of Abbotts Resurrection LP, a Pennsylvania limited partnership to be produced and filed with this company and proof that same is subsisting to date and has not been altered, amended or revoked.

(b)   A certificate forming Abbotts Resurrection LP, a Pennsylvania limited partnership to be produced.

16.   Certification for payment of all outstanding condominium assessments or charges to be furnished from the unit owners' association.

17.   Proof to be furnished that any special assessments relating to Business Improvement, Special Services or similar service District(s) have been paid In full through the current year.

18.   Most recent Philadelphia Gas Works billing statement to be produced and filed with the Company prior to settlement.

19.   City of Philadelphia Annual Rubbish/Recycling Fee:

a) Proof that the annual refuse collection fee has been paid, or
b) Produce acceptance letter from Streets Department for Owner's Commercial Solid Waste & Recycling Plan.

*First American Title Insurance Company*

Commitment No. NCS-760457-PHIL

20.    Municipal charges, including water and sewer (for each OPA parcel number) and gas for the current year and prior five years if not paid. If municipal certification in lieu of receipts is to be obtained, certification is to be obtained from each department and a report obtained from Philadelphia Department of Revenue, Agency Receivables as to miscellaneous municipal charges.

Case ID: 230702187

*First American Title Insurance Company*

Commitment No.  NCS-760457-PHIL

### SCHEDULE B - SECTION II

SCHEDULE B OF THE POLICY OR POLICIES TO BE ISSUED WILL CONTAIN EXCEPTIONS TO THE FOLLOWING MATTERS UNLESS THE SAME ARE DISPOSED OF TO THE SATISFACTION OF THE COMPANY:

1.  Defects, liens, encumbrances, adverse claims or other matters, if any, created, first appearing in the public records or attaching subsequent to the effective date hereof but prior to the date the proposed insured acquires for value of record the estate or interest or mortgage thereon covered by this commitment.

2.  Rights or claims by parties in possession under the terms of any unrecorded lease or agreement(s) of sale.  (may be removed by affidavit)

3.  Unrecorded easements, discrepancies or conflicts in boundary lines, shortages in area content and encroachments, which an accurate and satisfactory Land Title Survey would disclose.

4.  Possible interim real estate taxes by reason of increased assessments for new construction and/or major improvements, a lien not yet due and payable.

5.  Any lien, or right to a lien, for services, labor or material heretofore or hereafter furnished, imposed by law and not shown in the Public Records.

6.  Possible outstanding City of Philadelphia Municipal Charges.

7.  Declaration of Abbotts Square Condominium dated 3/22/1985 and recorded in Deed Book FHS 112 page 306; Clarification Amendment thereto dated 3/22/1985 and recorded in Deed Book FHS 112 page 303; Corrective Amendment thereto dated 6/4/1985 and recorded 6/6/1985 in Deed Book FHS 166 page 95; Amendment to Declaration recorded 10/4/2001 as Document No. 50336565, as further amended by Amendment recorded 9/10/2004 as Document No. 51011618 and Amendment to the Declaration of Abbotts Square Condominium recorded 7/27/2006 as Document No. 51495139.

8.  Construction, Operation and Reciprocal Agreement by and between Abbotts Square Development Corp. and Abbotts Square Associates dated 9/23/1983 and recorded in Deed Book EFP 844 page 323 as affected by Memorandum of Understanding between Abbotts Square Condominium Association and Stobba Associates, L.P. recorded 10/1/2013 as Document No. 52701732 and by Memorandum of Understanding between Abbotts Square Condominium Association and Stobba Associates, L.P. recorded 10/1/2013 as Document No. 52701733.

9.  Encroachment Agreement between Abbotts Square Development Corporation, Abotts Square Associates and Lombard Street Associates, L.P. dated 3/31/1989 and recorded 5/15/1989 in Deed Book FHS 1347 page 139.

10.  Easement in favor of the surface owner as set forth in Deed from Utotem, Inc. to Abbotts Square Development Corp. recorded in Deed Book EFP 844 page 286.

11.  Declaration of Covenants, Conditions and Restrictions as in Deed Book FHS 1400 page 353.

4.

Case ID: 230702187

*First American Title Insurance Company*

Commitment No. NCS-760457-PHIL

12. Memorandum of License by and between Abbotts Square Condominium Association and Cricket Communications, Inc. as set forth in Document No. 51953291.

13. Memorandum of Understanding by and between Abbotts Square Condominium Association, Inc. and Stobba Associates, L.P. recorded 10/01/2013 as Document No. 52701732.

14. Memorandum of Understanding by and between Abbotts Square Condominium Association, Inc. and Stobba Associates, L.P. recorded 10/01/2013 as Document No. 52701733.

Case ID: 230702187

<u>EXHIBIT E</u>

FORM OF

NON-DISTURBANCE AND RECOGNITION AGREEMENT (Subtenant)

Case ID: 230702187

Form of Guaranty

See next pages

Case ID: 230702187

<u>GUARANTY</u>

The undersigned, Ahold U.S.A. Inc., a corporation organized under the laws of Maryland, ("Guarantor"), does hereby make this Guaranty for the benefit of

_____ and its successors and assigns (hereinafter referred to as "Landlord");

WITNESSETH:

WHEREAS, Fresh Formats LLC, a limited liability company organized under the laws of the State of Delaware, U.S.A., having a place of business at 1385 Hancock Street, Quincy, Massachusetts 02169 (hereinafter referred to as "Tenant"), has entered into a Lease dated as of _____, 201_ (hereinafter referred to as the "Lease"), with Landlord concerning _____ (hereinafter referred to as "Leased Premises"); and

WHEREAS, Landlord has required that Guarantor guarantee the payment of all financial obligations of Tenant under the Lease.

NOW, THEREFORE, as an inducement to enter into the Lease and for other good and valuable consideration, the receipt whereof is hereby acknowledged, Guarantor represents and agrees as follows:

1.  Guarantor hereby irrevocably and unconditionally guarantees the due fulfillment by Tenant of all of Tenant's financial obligations under the Lease, which financial obligations shall include rent and additional rent due Landlord by reason of its performance of unperformed Tenant obligations under this Lease.

2.  A copy of any notice required to be given Tenant under the terms of the Lease shall simultaneously be sent by registered or certified mail, return receipt requested, to Guarantor c/o Ahold U.S.A., Inc., 1385 Hancock Street, Quincy, MA 02169, USA, Attention: Ahold U.S.A. Inc., General Counsel. Landlord's failure to provide such notice to Guarantor shall not void or impair the Guarantor's obligations hereunder, provided, however, that Guarantor shall not be liable for any particular claim until it shall have been provided with written notice of such claim required to be given Tenant under the Lease. In such event, Guarantor shall be provided an additional fifteen (15) days from the later of; (i) receipt of the written notice, or (ii) the expiration of the applicable cure period under the Lease, to cure such default.

3.  Guarantor hereby consents and submits irrevocably to the jurisdiction of the state and federal courts located in the State of _____ with respect to the provisions of this Guaranty. To the extent permitted by law, final judgment (a certified copy of which shall be conclusive evidence of the fact and of the amount of any indebtedness of Guarantor to Landlord, or its successors or assigns) against Guarantor in any such legal action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on an unsatisfied judgment.

4.  The obligations of Guarantor under the Guaranty shall not be released or limited in any manner because of Landlord's failure to exercise, or delay in the exercise of, any right granted hereunder or under the Lease.

-42-

Case ID: 230702187

5.     Except as may be provided to the contrary in the Lease, this Guaranty shall remain in full force and effect until such time as the financial obligations of Tenant guaranteed hereunder have been paid or satisfied, provided the financial obligations under the Lease have not been modified or amended without the prior written consent of Guarantor.

6.     Landlord may, with written notice to Guarantor as provided in Paragraph No. 2 above, assign this Guaranty, in whole or in part, to the holder of any mortgage covering the Leased Premises, and/or to any purchaser of Landlord's interest therein.

7.     Guarantor is a corporation duly organized, registered, in good standing, and validly existing under the laws of Maryland and has full power, authority and legal right to execute, deliver and perform this Guaranty; the Guaranty has been duly authorized, executed and delivered by the Guarantor and constitutes a legal, valid and binding obligation of the Guarantor enforceable in accordance with its terms.

8.     All obligations of Guarantor shall be satisfied in United States dollars.

9.     Landlord, at its option, shall have the right to (i) proceed against Guarantor to enforce the provisions of the Guaranty without first proceeding against the Tenant, or (ii) join Guarantor in any action or proceeding commenced by Landlord against Tenant.

10.    Guarantor (i) acknowledges that this Guaranty is a guarantee of payment and not of collection in respect to any obligations which may accrue to Landlord from Tenant under the provisions of the Lease; and (ii) covenants to and agrees with Landlord that, except as may be provided to the contrary in the Lease, the validity hereunder shall in no way be terminated, affected or otherwise impaired by reason of any assignment or transfer of Tenant's interest in the Lease.

11.    This Guaranty shall not be affected by any petition or other proceeding, whether voluntary or involuntary, brought by or against Tenant for adjudication or relief under any bankruptcy, reorganization, arrangement, composition, extension or insolvency law, or by any order for relief otherwise issued in accordance therewith.

12.    This Guaranty shall be construed and interpreted in accordance with the laws of the State of_____.

13.    This instrument may not be changed, modified, discharged, or terminated orally or in any manner other than by an agreement in writing signed by Guarantor and the Landlord.

Case ID: 230702187

IN WITNESS WHEREOF, This Guaranty was executed by Ahold U.S.A. Inc. by its undersigned duly authorized officer or agent this _____ day of _____, 201_.

ATTEST:                                                              Ahold U.S.A. Inc.


By: _____                                    By: Thomas A. Hippler
Title:                                                               Title: Executive Vice President and
                                                                               General Counsel




Location: _____

Case ID: 230702187

## FIRST AMENDMENT TO LEASE

**THIS FIRST AMENDMENT TO LEASE** ("**First Amendment**") is entered into as of this 4ᵀᴴ day of January, 2017 (the "**Effective Date**"), by and between Stobba Associates, L.P., a Pennsylvania limited partnership ("**Landlord**"), and Fresh Formats, LLC, a Delaware limited liability company ("**Tenant**").

## RECITALS

**WHEREAS**, Landlord and Tenant entered into that certain Lease dated March 9, 2016 (the "**Lease**"), with respect to certain premises (the "**Premises**") located in the building known as Abbotts Square (the "**Building**"), as more fully described in the Lease; and

**WHEREAS**, Landlord and Tenant desire to amend the Lease on the terms and conditions as set forth in this First Amendment.

**NOW, THEREFORE**, in consideration of the foregoing and the terms, covenants and agreements hereinafter provided and intending to be legally bound hereby, Landlord and Tenant, intending to be legally bound, covenant and agree, each with the other, that the Lease is amended as follows:

1.       **LANDLORD'S WORK.  Exhibit B** attached to the Lease is hereby replaced with the **Exhibit B** attached to this First Amendment, which replacement **Exhibit B** shall have full force and effect as if it were attached to the original Lease.

(a) All work outlined in the attached **EXHIBIT B** that is the responsibility of the Landlord and which is to be performed within the demised premises shall be completed on or before January 1, 2017

(b) all other work related to the demised premises being done in the Common Areas (as defined in the Lease), including but not limited to garage upgrades shall be completed by the later of; (i) April 1, 2017, or (ii) forty five (45) days prior to Tenants projected store opening, which is currently scheduled to be 12 weeks from the date Tenant starts construction in the demised premises.

2.       **LENDER APPROVAL; LEASE REINSTATEMENT.**  Lender (as such term is defined in Section 16.19 of the Lease) has approved the Lease. Landlord and Tenant agree that the Lease is hereby reinstated and of full force and effect.

3.       **RENT COMMENCEMENT.**  Subject to a day for day abatement of the Rent Commencement Date for items which Landlord is required to complete by January 1, 2017, but (subject to force majeure) fails to complete, the parties agree that the Rent Commencement Date shall be February 15, 2017. Should any abatement of the Rent Commencement Date become necessary the parties shall agree in writing as to the length of said abatement prior to the Rent Commencement Date.

4.       **MISCELLANEOUS.**

a.       Tenant hereby represents and warrants to Landlord that this First

Case ID: 230702187

Amendment constitutes the binding obligation of Tenant and is enforceable against the Tenant in accordance with its terms.

b.        Landlord hereby represents and warrants to Tenant that this First Amendment constitutes the binding obligation of Landlord and is enforceable against the Landlord in accordance with its terms.

c.        Except as modified and amended by this First Amendment, all of the other terms, covenants, agreements, representations, warranties, conditions, and the like set forth in the Lease remain in full force and effect.  In the event of any conflict or inconsistency between the terms and provisions of the Lease and the term and provisions of this First Amendment, the terms and provisions of this First Amendment shall govern and control.

d.        This First Amendment is to be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania, without reference to its conflicts of law principles, and is binding on the parties hereto and their respective successors and assigns.

e.        All capitalized terms used herein, which are not defined in this First Amendment, shall have the meanings ascribed to them in the Lease.
f.        As of the date hereof, the references in the Lease to "this Lease" shall be deemed to apply to the Lease, as modified by this First Amendment.

**[remainder of page intentionally left blank]**

**IN WITNESS WHEREOF,** the parties hereto have executed this First Amendment as of the day and year first above written.

Landlord:
STOBBA ASSOCIATES, L.P.

By: EB Stobba GP, Inc.
    Its general partner

By:_____
    Eric Blumenfeld  President

Tenant:
FRESH FORMATS, LLC

By:_____
Name:_____
Title:_____

Case ID: 230702187

**IN WITNESS WHEREOF,** the parties hereto have executed this First Amendment as of the day and year first above written.

Landlord:
STOBBA ASSOCIATES, L.P.

By: EB Stobba GP, Inc.
　　Its general partner

By:_____
　　Eric Blumenfeld, President

Tenant:
FRESH FORMATS, LLC

By:_____
Name:_____
Title:_____

3

Case ID: 230702187

Fresh Formats LLC
2nd and South, Abbott Sq., Philadelphia, PA
Date: Novemeber 7, 2016

## LANDLORD'S SCOPE OF WORK

### Fresh Formats, LLC – Exhibit B

THE LANDLORD SHALL PROVIDE THE BUILDING, THE PREMISES AND
LANDLORD'S RESIDENTIAL DEVELOPMENT PROJECT COMPLETED TO THE
EXTENT DEFINED BELOW AND IN ACCORDANCE WITH THE ATTACHED
CONSTRUCTION COMPLETION SCHEDULE (EXHIBIT B-):

1.    PERMITS AND APPROVALS

Landlord shall acquire permits and approvals for all work described in this Exhibit B
(collectively the "Landlord's Work"). Landlord will deliver the Premises in Compliance
with all applicable codes and ordinances.

2.    CONDITION AND DEMISING OF PREMISES

Landlord shall deliver the Premises to Tenant vacant and free and clear of all leases,
subleases, tenancies and rights of occupants and in a broom clean condition, free of all
materials, debris, fixtures, and personal property.

Landlord shall construct:

      a.  A new fire rated demising partition consisting of one or more walls
which shall separate the Premises from the adjacent Chef's Table space
on the first floor and mezzanine levels (the "Demising Wall"),

      b.  A new, relocated wall separating the residential lobby area from the
premises along column line 3.

Both walls shall be constructed as shown and noted on the fixture plan identified as F-1
dated 10-18-16 Revision 17 attached hereto as a portion of Exhibit B-1 and made a part
hereof.

2.1    DEMOLITION, SEPARATION OF DEMISED PREMISES AND
LANDLORD'S RESIDENTIAL PROJECT.

Landlord shall:

      a.  Remove and terminate back to their origin all nonfunctional mechanical,
electrical and plumbing systems.

      b.  Remove all non-bearing walls (except walls that define the perimeter of the
demised space), supports, hangers and all fasteners used to support such
systems. All supports, hangers and fasteners to be cut and/or removed with
holes patched with appropriate material. Landlord to install lintels on wing
walls located on the South Street interior wall between columns R and S
needed for Tenant to remove wing walls.

1

Case ID: 230702187

Fresh Formats LLC
2nd and South, Abbott Sq., Philadelphia, PA
Date: Novemeber 7, 2016

    c.   Separation of utilities: Landlord shall separate all utilities delivered to tenant from all other tenants in the building. In addition, Landlord shall relocate as necessary any existing utilities, gas piping and meters, storm drains, or sanitary drains that conflict with the Tenant's fixture plan F-1 dated 10-18-16 Revision 17 attached hereto.

    d.   All work associated with the proposed Landlord's Residential project above the demised premises that will impact the Fresh Format Demised space shall be completed. This work includes, but may not be limited to, overhead plumbing with panning of sanitary piping with adequate drainage (as set forth in 6.2 below), the relocation of the existing fire sprinkler main/branch piping needed to accommodate landlord's residential sanitary lines, any structural modifications to the base building, all utilities that may run through Tenant's Premises and any exterior work required to use the adjacent sidewalks.

    e.   LL shall acoustically seal around all utility penetrations between Landlord's Residential project above the demised premises.

3.     SERVICE CORRIDORS and DOORS

Landlord shall provide access to Tenant from the exterior of the Building to the Premises through service corridors located on the ground floor and mezzanine levels with a minimum width of 3 ½ feet (the "Service Corridors") in the locations shown on fixture plan identified as F-1 dated 10-18-16 revision 17 attached hereto as a portion of Exhibit B-1 and made a part hereof. Landlord shall also construct a door for access to the service corridor on the first floor of the Premises (the "Service Corridor Door"), in the location shown on the fixture plan identified as F-1 dated 10-18-16 Revision 17 as attached hereto as a portion of Exhibit B-1 and made a part hereof. Such door shall be a hollow metal door 3 feet by 7 feet with a 90 minute fire rating or equal. Landlord to leave 3' x 7' opening on the mezzanine level for access to the upper mezzanine hallway as shown on F-1 dated 10-18-16 Revision 17. (Tenant to enlarge this opening and install a double door).

4.     PARKING GARAGE/ /ELEVATOR/ELEVATOR LOBBIES

Landlord shall: Clean the lower level parking facilities, elevator lobby and elevator cab. These areas shall be free of all trash and debris and professionally steam -cleaned to remove obnoxious odors. Painting upgrades shall be completed to these areas including removal of graffiti. Lighting in these areas shall be upgraded to a minimum three (3) foot candle to ensure customer safety. Replacement and repair of existing garage ceiling and lighting.

5.     EQUIPMENT AREA (fenced)

Tenant shall have the exclusive use of a portion of the lower parking deck for the installation by Tenant of a fenced area for new mechanical, plumbing, electrical and refrigeration equipment (the "Equipment Room") in the location shown on the drawing entitled LEI.0 dated 6/28/16 and prepared by JKRP Architects.

Case ID: 230702187

Fresh Formats LLC
2nd and South, Abbott Sq., Philadelphia, PA
Date: Novemeber 7, 2016

6.    UTILITIES

6.1    WATER SERVICE

Landlord shall provide a 2" waterline stubbed into the Premises and terminated
with a valve at the location within the demised premises at column line 2 and J.
The water service comes into the building along Second Street, adjacent to
column line 3, at the parking garage level. Landlord will also provide a backflow
preventer and meter at the point of entry as required by applicable codes.

6.2    SANITARY SERVICE

Landlord shall provide new sanitary systems for Landlord's Residential
Development Project (as defined below). Landlord shall install new mutually
acceptable drip pans including drainage for all horizontal sanitary and storm
piping. The locations of new vertical plumbing lines through the Premises to be
in the locations designated by Landlord apartments above and disclosed on the
Residential Project Work described in Paragraph 9 below. In addition, Landlord
shall provide pans with adequate drainage for existing piping related to the
Chef's Market space located above the demised premises.

Tenant's sanitary lines shall be located below the first floor. The locations of the
sanitary lines are based on the tenant's fixture layout and take place at several
locations throughout the demised premises. These lines shall be connected to the
Landlord's existing sanitary system below the garage floor. Landlord shall
provide connection points for all vents required for tenant's sanitary lines. Such
vents shall extend up through the roof and vent to the atmosphere. Tenant shall
be responsible for all final connections to such vents. Locations of such existing
vents shall be identified by the Landlord on a drawing or plan delivered to Tenant
and coordinated with the Tenant's plumbing engineer per drawings LP.1 through
LP.4 dated 6/28/16. Landlord is responsible to provide  the sanitary connections
in the garage level including restoration work related to garage slab, provide all
underground rough-in with stub up / capped 1 foot above garage slab to nearest
column or wall location as shown on Exhibit B-1, LP.2 plan per drawing dated
6-28-16. The tenant will be responsible for all distribution at underside of plank
floor in garage level and connection into LL provided stub ups.

6.3    GAS SERVICE

Landlord shall bring new gas service stubbed into the premises and terminated/
capped off as depicted on Exhibit B-1, LP.2 dated 6/28/16 and prepared by JKRP
Architects. Gas Service shall be metered by the utility company. Metering,
service and connections to the Premises will be the responsibility of the
Landlord. Landlord shall furnish and install a gas booster (Spencer model GL
0325-1/2-R) to provide the required gas pressure needed for Tenant's operation

3

Case ID: 230702187

Fresh Formats LLC
2nd and South, Abbott Sq., Philadelphia, PA
Date: Novemeber 7, 2016

of gas fired equipment as depicted on Exhibit B-1, LP.2 dated 06/28/16 and prepared by JKRP Architects. Landlord will make the electrical connections to the gas booster.

6.4   HVAC

All HVAC work shall be provided and installed by the Tenant including all HVAC systems, refrigeration systems, exhaust systems, and make-up air systems. The HVAC systems for the tenant shall be connected to the building cooling tower loop.

Landlord has identified to Tenant where (Exhibit B-1 LP.1, Detail #3 dated 06/28/16 and prepared by JKRP Architects) the pipe connections to the Building's water source heat pump loop can be made to support the HVAC cooling capacity required for the Tenant's demised space.  Tenant shall connect to LL's existing condenser water system. Tenant's total cooling capacity shall be 50 tons based on standard operating conditions.

6.5   ELECTRICAL
Landlord shall provide metered electrical service to the demised Premises. Service to originate from existing Mezzanine service corridor re-using existing 277/480 volt, 800 amp bus duct switch and shall include service conduit, service conductors, Main Distribution Panel ("MDP") and circuit breakers as indicated on Drawing ED-1 Revision 1 dated 5/13/16 and on E-3 Revision 1, Mezzanine Plan dated 5/13/16.

6.6   FIRE ALARM SYSTEM

Any required reprogramming and testing of the existing building system to accommodate Tenant's fire alarm system shall be provided by Landlord. Landlord shall provide interconnecting wiring from Fresh Formats fire alarm control panel to building system along with any required devices for system compatibility.

6.7   SPRINKLER:

Landlord shall provide a code compliant sprinkler system throughout the Tenant's demised areas. Tenant will be responsible to modify the existing sprinkler system to accommodate Tenants room layouts and added ceilings.

6.8   TELEPHONE/INTERNET

Landlord to provide 2- 4" empty conduits to the demised space from the buildings demark location to a location in Tenants data room located in the mezzanine area of the demised premises, shown on fixture plan identified as F-1 dated 10/18/16 Revision 17 prepared by Fresh Formats LLC attached hereto as a portion of Exhibit B-1 and made a part hereof.

4

Case ID: 230702187



Filed and Attested by the
Office of Judicial Records
21 JUL 2023 04:35 pm
S. RICE

# Exhibit 2

Case ID: 230702187

GUARANTY

The undersigned, Ahold U.S.A. Inc., a corporation organized under the laws of Maryland, ("Guarantor"), does hereby make this Guaranty for the benefit of

Stobba Associates, L.P. and its successors and assigns (hereinafter referred to as "Landlord");

WITNESSETH:

WHEREAS, Fresh Formats LLC, a limited liability company organized under the laws of the State of Delaware, U.S.A., having a place of business at 1385 Hancock Street, Quincy, Massachusetts 02169 (hereinafter referred to as "Tenant"), has entered into a Lease dated as of MARCH 9 , 2016 (hereinafter referred to as the "Lease"), with Landlord concerning 16,831 S.F. of space located at 201 South Street, Philadelphia, Pennsylvania (hereinafter referred to as "Leased Premises"); and

WHEREAS, Landlord has required that Guarantor guarantee the payment of all financial obligations of Tenant under the Lease.

NOW, THEREFORE, as an inducement to enter into the Lease and for other good and valuable consideration, the receipt whereof is hereby acknowledged, Guarantor represents and agrees as follows:

1.      Guarantor hereby irrevocably and unconditionally guarantees the due fulfillment by Tenant of all of Tenant's financial obligations under the Lease, which financial obligations shall include rent and additional rent due Landlord by reason of its performance of unperformed Tenant obligations under this Lease.

2.      A copy of any notice required to be given Tenant under the terms of the Lease shall simultaneously be sent by registered or certified mail, return receipt requested, to Guarantor c/o Ahold U.S.A., Inc., 1385 Hancock Street, Quincy, MA 02169, USA, Attention: Ahold U.S.A. Inc., General Counsel. Landlord's failure to provide such notice to Guarantor shall not void or impair the Guarantor's obligations hereunder, provided, however, that Guarantor shall not be liable for any particular claim until it shall have been provided with written notice of such claim required to be given Tenant under the Lease. In such event, Guarantor shall be provided an additional fifteen (15) days from the later of; (i) receipt of the written notice, or (ii) the expiration of the applicable cure period under the Lease, to cure such default.

3.      Guarantor hereby consents and submits irrevocably to the jurisdiction of the state and federal courts located in the Commonwealth of Pennsylvania with respect to the provisions of this Guaranty. To the extent permitted by law, final judgment (a certified copy of which shall be conclusive evidence of the fact and of the amount of any indebtedness of Guarantor to Landlord, or its successors or assigns) against Guarantor in any such legal action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on an unsatisfied judgment.

4.      The obligations of Guarantor under the Guaranty shall not be released or limited in any manner because of Landlord's failure to exercise, or delay in the exercise of, any right granted hereunder or under the Lease.

Case ID: 230702187

5.      Except as may be provided to the contrary in the Lease, this Guaranty shall remain in full force and effect until such time as the financial obligations of Tenant guaranteed hereunder have been paid or satisfied, provided the financial obligations under the Lease have not been modified or amended without the prior written consent of Guarantor.

6.      Landlord may, with written notice to Guarantor as provided in Paragraph No. 2 above, assign this Guaranty, in whole or in part, to the holder of any mortgage covering the Leased Premises, and/or to any purchaser of Landlord's interest therein.

7.      Guarantor is a corporation duly organized, registered, in good standing, and validly existing under the laws of Maryland and has full power, authority and legal right to execute, deliver and perform this Guaranty; the Guaranty has been duly authorized, executed and delivered by the Guarantor and constitutes a legal, valid and binding obligation of the Guarantor enforceable in accordance with its terms.

8.      All obligations of Guarantor shall be satisfied in United States dollars.

9.      Landlord, at its option, shall have the right to (i) proceed against Guarantor to enforce the provisions of the Guaranty without first proceeding against the Tenant, or (ii) join Guarantor in any action or proceeding commenced by Landlord against Tenant.

10.     Guarantor (i) acknowledges that this Guaranty is a guarantee of payment and not of collection in respect to any obligations which may accrue to Landlord from Tenant under the provisions of the Lease; and (ii) covenants to and agrees with Landlord that, except as may be provided to the contrary in the Lease, the validity hereunder shall in no way be terminated, affected or otherwise impaired by reason of any assignment or transfer of Tenant's interest in the Lease.

11.     This Guaranty shall not be affected by any petition or other proceeding, whether voluntary or involuntary, brought by or against Tenant for adjudication or relief under any bankruptcy, reorganization, arrangement, composition, extension or insolvency law, or by any order for relief otherwise issued in accordance therewith.

12.     This Guaranty shall be construed and interpreted in accordance with the laws of the Commonwealth of Pennsylvania.

13.     This instrument may not be changed, modified, discharged, or terminated orally or in any manner other than by an agreement in writing signed by Guarantor and the Landlord.

IN WITNESS WHEREOF, This Guaranty was executed by Ahold U.S.A. Inc. by its undersigned duly authorized officer or agent this 18th day of March , 2016.

ATTEST:                                                          Ahold U.S.A. Inc.

By: CAROLINE WOODWARD                              By: Thomas A. Hippler
Title: ASSISTANT SECRETARY                          Title: Executive Vice President and
                                                                              General Counsel

Location: 201 South Street, Philadelphia Pa.

Case ID: 230702187



Filed and Attested by the
Office of Judicial Records
21 JUL 2023 04:35 pm
S. RICE

# Exhibit 3

## ASSIGNMENT AND ASSUMPTION OF LEASE

This Assignment and Assumption of Lease (this "Assignment") dated as of December 31, 2017, by which **FRESH FORMATS LLC**, a Delaware limited liability company having its principal office at 780 Dedham Street, Suite 600, Canton, Massachusetts 02021 ("Assignor"), for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration to it paid by **GIANT FOOD STORES, LLC**, a Delaware limited liability company having an address of 1385 Hancock Street, Quincy, Massachusetts 02169 ("Assignee"), the receipt and sufficiency of which are hereby acknowledged, hereby assigns, transfers and sets over unto Assignee, effective as of the date hereof, all of Assignor's right, title and interest in and to that certain lease described as Lease dated March 9, 2016, as amended by First Amendment to Lease dated as of January 4, 2017, by and between Stobba Associates, L.P., as Landlord, and Fresh Formats LLC, as Tenant, demising premises at 201 South Street (Abbotts Square), Philadelphia, PA (the "Lease"), together with all right and interest of Assignor in and to the premises demised under the Lease (the "Premises"), and together with all right and interest of Assignor in and to the instruments and agreements, if any, affecting the Lease and/or the Premises.

TO HAVE AND TO HOLD the same unto Assignee, its successors and assigns forever, subject to the terms, covenants, conditions and provisions of the Lease.

ASSIGNEE hereby agrees to accept the Premises in "as is" condition as the same exists on the date of this Assignment and Assumption of Lease without any representations or warranties expressed or implied by Assignor.

ASSIGNEE hereby accepts this Assignment and assumes, for the benefit of Assignor and Landlord, the full and timely payment and performance of all of the covenants, agreements, terms, provisions, conditions, limitations and other obligations accruing and to be paid or performed on the part  of Assignor under the Lease on and after the date hereof, and Assignee agrees to indemnify, defend and hold Assignor harmless of and from all liability, loss, damage or expense related to any claim or claims asserted by any person or entity under or with respect to the Lease, or the tenant's obligations under the Lease, as well as all liability arising with respect to the Premises from and after the date hereof.

EXCEPT AS HEREIN PROVIDED, this Assignment is made by Assignor without any representation or warranty whatsoever and upon the express condition understanding and agreement that this Assignment is made without recourse to Assignor by Assignee or by any person, firm, corporation or other entity claiming by, through or under Assignee, for any cause whatsoever. The terms and provisions of this Assignment and Assumption of Lease shall inure to the benefit of, and shall be binding upon, the parties hereto, and their respective successors, transferees and assigns.

[Signature Page Follows]

Case ID: 230702187

**IN WITNESS WHEREOF,** the parties hereto have caused this Assignment and Assumption of Lease to be duly executed as a sealed instrument as of this 31st day of December, 2017.

WITNESSES:                                ASSIGNOR:

FRESH FORMATS LLC

By: _____

Name: Dean Wilkinson

Title: General Manager


ASSIGNEE:

GIANT FOOD STORES, LLC

By: _____

Name: _____
      Caroline Woodward

Title: _____
      Assistant Secretary


[Acknowledgements on Next Page]


- 2 -

00783550.2

Case ID: 230702187

COMMONWEALTH OF MASSACHUSETTS

Middlesex, ss.

On this 28th day of December, 2017, before me, the undersigned notary public, personally appeared Dean Wilkinson proved to me through satisfactory evidence of identification, which was personal knowledge, to be the person whose name is signed on the preceding or attached document, and acknowledged to me that he signed it voluntarily for its stated purpose as General Manager of FRESH FORMATS LLC, a Delaware limited liability company, as his free act and deed.

Jennifer L. Ioli
Notary Public
My Commission expires: 5/27/2022



[SEAL]

COMMONWEALTH OF MASSACHUSETTS

Norfolk, ss.

On this 28th day of December, 2017, before me, the undersigned notary public, personally appeared Carline Woodward proved to me through satisfactory evidence of identification, which was personal knowledge, to be the person whose name is signed on the preceding or attached document, and acknowledged to me that she signed it voluntarily for its stated purpose as Assistant Secretary of GIANT FOOD STORES, LLC, a Delaware limited liability company, as his free act and deed.

Carol A. DeChristopher
Notary Public
My Commission expires:

Carol A. DeChristopher
Notary Public
COMMONWEALTH OF MASSACHUSETTS
My Commission Expires
February 10, 2023

[SEAL]

- 3 -

Case ID: 230702187



Filed and Attested by the
Office of Judicial Records
21 JUL 2023 04:35 pm
S. RICE

# Exhibit 4

Case ID: 230702187

Stobba Associates, L.P.
530 South 2nd Street
Suite 110
Philadelphia  PA  19147
215-625-9950

December 15, 2020

Giant Food Stores, LLC
Attention: Lease Administration
1385 Hancock Street
Quincy, MA  02169

RE:      GIANT / MARTIN'S #6550, Philadelphia, PA

Dear Tenant:

Please be advised that Giant Food Stores LLC is in default of the Lease dated March 9, 2016 between Fresh Formats, LLC and Stobba Associates, L.P., as amended by the First Amendment dated January 4, 2017 and as assigned by the Assignment and Assumption of Lease dated December 31 ,2017.

Under Article III, Section 3.2 of the lease, Rent is payable on the first day of each calendar month during the term of the Lease.

December, 2020 rent, in the amount of $55,614.80, was due on December 1, 2020 and has not been received as of today.  Please pay this amount immediately. We appreciate your prompt attention to this matter.

Sincerely,

Eric Blumenfeld
By: EB Stobba GP, Inc.
     Its general Partner

With copy to:
Mr. Torsten M. Kracht
Hunton Andrews Kurth LLP
2200 Pennsylvania Avenue NW, Washington, DC 20037

Todd Robinson
Ahold USA
1149 Harrisburg Pike, Carlisle, PA 17013

# COMMERCE PROGRAM ADDENDUM
## TO CIVIL COVER SHEET

This case is subject to the Commerce Program because it is not an arbitration matter and it falls within one or more of the following types (check all applicable):

_____ 1.  Actions relating to the internal affairs or governance, dissolution or liquidation, rights or obligations between or among owners (shareholders, partners, members), or liability or indemnity of managers (officers, directors, managers, trustees, or members or partners functioning as managers) of business corporations, partnerships, limited partnerships, limited liability companies or partnerships, professional associations, business trusts, joint ventures or other business enterprises, including but not limited to any actions involving interpretation of the rights or obligations under the organic law (e.g., Pa. Business Corporation Law), articles of incorporation, by-laws or agreements governing such enterprises;

**X** 2.  Disputes between or among two or more business enterprises relating to transactions, business relationships or contracts between or among the business enterprises. Examples of such transactions, relationships and contracts include:

      _____ a.  Uniform Commercial Code transactions;

      _____ b.  Purchases or sales of business or the assets of businesses;

      _____ c.  Sales of goods or services by or to business enterprises;

      _____ d.  Non-consumer bank or brokerage accounts, including loan, deposit cash management and investment accounts;

      _____ e.  Surety bonds;

      **X** f.  Purchases or sales or leases of, or security interests in, commercial, real or personal property; and

      _____ g.  Franchisor/franchisee relationships.

_____ 3.  Actions relating to trade secret or non-compete agreements;

**X** 4.  "Business torts," such as claims of unfair competition, or interference with contractual relations or prospective contractual relations;

_____ 5.  Actions relating to intellectual property disputes;

_____ 6.  Actions relating to securities, or relating to or arising under the Pennsylvania Securities Act;

_____ 7.  Derivative actions and class actions based on claims otherwise falling within these ten types, such as shareholder class actions, but not including consumer class actions, personal injury class actions, and products liability class actions;

_____ 8.  Actions relating to corporate trust affairs;

_____ 9.  Declaratory judgment actions brought by insurers, and coverage dispute and bad faith claims brought by insureds, where the dispute arises from a business or commercial insurance policy, such as a Comprehensive General Liability policy;

_____ 10.  Third-party indemnification claims against insurance companies where the subject insurance policy is a business or commercial policy and where the underlying dispute would otherwise be subject to the Commerce Program, not including claims where the underlying dispute is principally a personal injury claim.

**BRAVERMAN KASKEY GARBER PC**
BENJAMIN A. GARBER, ESQUIRE (No. 306765)
One Liberty Place, 56th Floor
1650 Market Street
Philadelphia, PA 19103
(215) 575-3800 (Telephone)
(215) 575-3801 (Facsimile)
bgarber@braverlaw.com



Filed and Attested by the
Office of Judicial Records
27 JUL 2023 03:33 pm
S. GILLIAM

*Attorneys for Plaintiff*

---

| | | |
|---|---|---|
| **STOBBA ASSOCIATES, L.P.** | : | PHILADELPHIA COUNTY |
| | : | COURT OF COMMON PLEAS, PA |
| *Plaintiff,* | : | CIVIL ACTION |
| | : | |
| | : | CASE NO. 02187 |
| v. | : | |
| | : | JULY TERM, 2023 |
| **GIANT FOOD STORES, LLC** | : | |
| **n/k/a THE GIANT COMPANY LLC** | : | JURY TRIAL DEMANDED |
| and | : | |
| **AHOLD U.S.A., INC.** | : | COMMERCE PROGRAM |
| and | : | |
| **TODD ROBINSON** | : | |
| and | : | |
| **BRADLEY MARKLE** | : | |
| | : | |
| *Defendants.* | : | |

---

## <u>AFFIDAVIT OF RETURN OF SERVICE BY OVERNIGHT MAIL</u>

I, Domenic J. Marano, a competent adult being duly sworn according to law, depose and state that on July 24, 2023, I sent a true and correct copy of Plaintiff's Verified Complaint with Notice to Defend ("Complaint") filed in the above-captioned case by Federal Express overnight mail (FED EX Tracking Number 817387867753) to defendant Giant Food Stores, LLC a/k/a The Giant Company LLC ("Defendant") via Defendant's registered business agent Corporation Service Company ("Agent") located at 251 Little Falls Drive, Wilmington, Delaware 19808.

A true and correct copy of the Federal Express Airbill showing date of mailing of July 24, 2023 is attached hereto as **Exhibit A**.

On July 25, 2023 at approximately 9:50 a.m., Federal Express delivered the Complaint to Defendant's Agent.  A true and correct copy of Federal Express Proof of Delivery is attached hereto as **Exhibit B**.

I make these statements pursuant to 18 Pa. Cons. Stat. Ann. § 4904 relating to unsworn falsification to authorities and understand that false statements may subject me to criminal penalties under that statute.

Dated: July 27, 2021

Domenic J. Marano, Paralegal
One Liberty Place, 56th Floor
1650 Market Street
Philadelphia, PA 19103

Case ID: 230702187



Filed and Attested by the
Office of Judicial Records
27 JUL 2023 03:33 pm
S. GILLIAM

# EXHIBIT   A

IUR 1

**FedEx** Express

Package
US Airbill

FedEx
Tracking
Number  **8173 8786 7753**

Form
ID No.  **0215**

Sender's Copy

Packages up to 150 lbs.
For packages over 150 lbs, use the
FedEx Express Freight US Airbill.

**1  From**  Please print and press hard.

Date  7-24-23    Sender's FedEx
Account Number   SENDER'S FEDEX ACCOUNT NUMBER ONLY   154-3UN184148

Sender's
Name  Dominic Manono                Phone  215 575-3800

Company  BRAVERMAN  KASKEY

Address  1650 MARKET ST FL 56                      Dept/Floor/Suite/Room

City  PHILADELPHIA        State  PA  ZIP  19103-7337

**2  Your Internal Billing Reference**
First 24 characters will appear on invoice.    69190-080

**3  To**

Recipient's
Name                            Phone ( 800 ) 927-9800

Company  CORPORATION SERVICE COMPANY

Address
We cannot deliver to P.O. boxes or P.O. ZIP codes.            Dept/Floor/Suite/Room

Address  251 LITTLE FALLS DRIVE
Use this line for the HOLD location address or for continuation of your shipping address.

City  WILMINGTON        State  DE  ZIP  19808

0138824136

**4  Express Package Service**  * To most locations.

**Next Business Day**

☐ FedEx First Overnight
Earliest next business morning delivery to select
locations. Friday shipments will be delivered on
Monday unless Saturday Delivery is selected.

☑ FedEx Priority Overnight
Next business morning.* Friday shipments will be
delivered on Monday unless Saturday Delivery
is selected.

☐ FedEx Standard Overnight
Next business afternoon.*
Saturday Delivery NOT available.

**2 or 3 Business Days**

☐ FedEx 2Day A.M.
Second business morning.*
Saturday Delivery NOT available.

☐ FedEx 2Day
Second business afternoon.* Thursday shipments
will be delivered on Monday unless Saturday
Delivery is selected.

☐ FedEx Express Saver
Third business day.*
Saturday Delivery NOT available.

**5  Packaging**  * Declared value limit $500.

☐ FedEx Envelope*    ☑ FedEx Pak*    ☐ FedEx Box    ☐ FedEx Tube    ☐ Other

**6  Special Handling and Delivery Signature Options**  Fees may apply. See the FedEx Service Guide.

☐ Saturday Delivery
FedEx Standard Overnight, FedEx 2Day A.M., or FedEx Express Saver.

☐ No Signature Required
Package may be left without
obtaining a signature for delivery.

☑ Direct Signature
Someone at recipient's address
may sign for delivery.

☐ Indirect Signature
If no one is available at recipient's
address, someone at a neighboring
address may sign for delivery. For
residential deliveries only.

**Does this shipment contain dangerous goods?**
One box must be checked.

☑ No    ☐ Yes  As per attached
Shipper's Declaration.    ☐ Yes  Shipper's Declaration
not required.    ☐ Dry Ice  Dry Ice, 9, UN 1845 ___ x ___ kg

Restrictions apply for dangerous goods—see the current FedEx Service Guide.    ☐ Cargo Aircraft Only

**7  Payment**  Bill to:

☑ Sender
Acct. No. in Section
1 will be billed.    Enter FedEx Acct. No. below    ☐ Recipient    ☐ Third Party

FedEx Acct. No.

This airbill can be used only when billing to a FedEx
account number. For cash, check, or credit card
transactions, please go to a staffed shipping location.

Total Packages    Total Weight _____ lbs.    Total Declared Value†

611

†Our liability is limited to US$100 unless you declare a higher value. See back for details. By using this airbill you
agree to the service conditions on the back of this airbill and in the current FedEx Service Guide, including terms
that limit our liability.
Rev. Date 3/19 • Part #163134 • ©1994–2019 FedEx • PRINTED IN U.S.A.

🖱 **Leave the packing to the pros at FedEx Office.**
Go to fedex.com/office.



*Filed and Attested by the*
*Office of Judicial Records*
*27 JUL 2023 03:33 pm*
*S. GILLIAM*

# EXHIBIT  B

July 26, 2023

Dear Customer,

The following is the proof-of-delivery for tracking number: 817387867753

**Delivery Information:**

| | | | |
|---|---|---|---|
| Status: | Delivered | Delivered To: | Shipping/Receiving |
| Signed for by: | P.SISOFO | Delivery Location: | |
| Service type: | FedEx Priority Overnight | | |
| Special Handling: | Deliver Weekday; Direct Signature Required | | WILMINGTON, DE, |
| | | Delivery date: | Jul 25, 2023 09:50 |

**Shipping Information:**

| | | | |
|---|---|---|---|
| Tracking number: | 817387867753 | Ship Date: | Jul 24, 2023 |
| | | Weight: | |

**Recipient:**

WILMINGTON, DE, US,

**Shipper:**

PHILADELPHIA, PA, US,

**Reference**          69190 080

Signature image is available. In order to view image and detailed information, the shipper or payor account number of the shipment must be provided.

Thank you for choosing FedEx

**BRAVERMAN KASKEY GARBER PC**
BENJAMIN A. GARBER, ESQUIRE (No. 306765)
One Liberty Place, 56th Floor
1650 Market Street
Philadelphia, PA 19103
(215) 575-3800 (Telephone)
(215) 575-3801 (Facsimile)
bgarber@braverlaw.com

*Filed and Attested by the Office of Judicial Records 27 JUL 2023 03:36 pm S. GILLIAM*

*Attorneys for Plaintiff*

| | | |
|---|---|---|
| **STOBBA ASSOCIATES, L.P.** | : | PHILADELPHIA COUNTY |
| | : | COURT OF COMMON PLEAS, PA |
| *Plaintiff,* | : | CIVIL ACTION |
| | : | |
| | : | CASE NO. <u>02187</u> |
| v. | : | |
| | : | JULY TERM, 2023 |
| **GIANT FOOD STORES, LLC** | : | |
| **n/k/a THE GIANT COMPANY LLC** | : | JURY TRIAL DEMANDED |
| and | : | |
| **AHOLD U.S.A., INC.** | : | COMMERCE PROGRAM |
| and | : | |
| **TODD ROBINSON** | : | |
| and | : | |
| **BRADLEY MARKLE** | : | |
| | : | |
| *Defendants.* | : | |

## <u>AFFIDAVIT OF RETURN OF SERVICE BY OVERNIGHT MAIL</u>

I, Domenic J. Marano, a competent adult being duly sworn according to law, depose and

state that on July 24, 2023, I sent a true and correct copy of Plaintiff's Verified Complaint with

Notice to Defend ("Complaint") filed in the above-captioned case by Federal Express overnight

mail (FED EX Tracking Number 817387867731) to defendant Ahold U.S.A., Inc. ("Defendant")

via Defendant's registered business agent CSC-Lawyers Incorporating Service Co. ("Agent")

located at 7 St. Paul Street, Suite 820, Baltimore, Maryland 21202.

A true and correct copy of the Federal Express Airbill showing date of mailing of July

24, 2023 is attached hereto as **Exhibit A**.

On July 25, 2023 at approximately 8:47 a.m., Federal Express delivered the Complaint to Defendant's Agent.  A true and correct copy of Federal Express Proof of Delivery is attached hereto as **Exhibit B**.

I make these statements pursuant to 18 Pa. Cons. Stat. Ann. § 4904 relating to unsworn falsification to authorities and understand that false statements may subject me to criminal penalties under that statute.

Dated: July 27, 2021

Domenic J. Marano, Paralegal
One Liberty Place, 56th Floor
1650 Market Street
Philadelphia, PA 19103

Case ID: 230702187



Filed and Attested by the
Office of Judicial Records
27 JUL 2023 03:36 pm
S. GILLIAM

# EXHIBIT   A

**FedEx** Express

Package
US Airbill

FedEx Tracking Number   8173 8786 7731

Form ID No. **0215**   Sender's Copy

**1 From** *Please print and press hard.*

Date 7-24-23

Sender's FedEx Account Number   SENDER'S FEDEX ACCOUNT NUMBER ONLY

Sender's Name  Dominic Manano   Phone (215) 575-3800

Company  BRAVERMAN KASKEY

Address  1650 MARKET ST FL. 56

Dept./Floor/Suite/Room

City  PHILADELPHIA   State  PA   ZIP  19103-7337

**2 Your Internal Billing Reference**
First 24 characters will appear on invoice.   69190 080

**3 To**

Recipient's Name   Phone ( 800,927.9800

Company  CSC-LAWYERS Incorporating Service Co.

Address  7 St. Paul St., Suite 820
We cannot deliver to P.O. boxes or P.O. ZIP codes.

Dept./Floor/Suite/Room

Address
Use this line for the HOLD location address or for continuation of your shipping address.

City  BALTIMORE   State  MD   ZIP  21202

Hold Weekday
FedEx location address
REQUIRED. Available ONLY for
FedEx First Overnight.

Hold Saturday
FedEx location address
REQUIRED. Available ONLY for
FedEx Priority Overnight and
FedEx 2Day to select locations.

0138824136

Shipping online just got easier.
Go to fedex.com/lite

**4 Express Package Service**   * To most locations.

Packages up to 150 lbs.
For packages over 150 lbs., use the
FedEx Express Freight US Airbill.

**Next Business Day**

☐ FedEx First Overnight
Earliest next business morning delivery to select
locations. Friday shipments will be delivered on
Monday unless Saturday Delivery is selected.

☑ FedEx Priority Overnight
Next business morning.* Friday shipments will be
delivered on Monday unless Saturday Delivery
is selected.

☐ FedEx Standard Overnight
Next business afternoon.*
Saturday Delivery NOT available.

**2 or 3 Business Days**

☐ FedEx 2Day A.M.
Second business morning.*
Saturday Delivery NOT available.

☐ FedEx 2Day
Second business afternoon.* Thursday shipments
will be delivered on Monday unless Saturday
Delivery is selected.

☐ FedEx Express Saver
Third business day.*
Saturday Delivery NOT available.

**5 Packaging**   * Declared value limit $500.

☐ FedEx Envelope*   ☑ FedEx Pak*   ☐ FedEx Box   ☐ FedEx Tube   ☐ Other

**6 Special Handling and Delivery Signature Options**   Fees may apply. See the FedEx Service Guide.

☐ Saturday Delivery
NOT available for FedEx Standard Overnight, FedEx 2Day A.M., or FedEx Express Saver.

☐ No Signature Required
Package may be left without
obtaining a signature for delivery.

☑ Direct Signature
Someone at recipient's
address may sign for delivery.

☐ Indirect Signature
If no one is available at recipient's
address, someone at a neighboring
address may sign for delivery. For
residential deliveries only.

**Does this shipment contain dangerous goods?**
One box must be checked.

☑ No   ☐ Yes
As per attached
Shipper's Declaration.   ☐ Yes
Shipper's Declaration
not required.   ☐ Dry Ice
Dry Ice, 9, UN 1845 ___ x ___ kg

Restrictions apply for dangerous goods—see the current FedEx Service Guide.   ☐ Cargo Aircraft Only

**7 Payment**   Bill to:

Enter FedEx Acct. No. below

☑ Sender
Acct. No. in Section
1 will be billed.   ☐ Recipient   ☐ Third Party

This airbill can be used only when billing to a FedEx
account number. For cash, check, or credit card
transactions, please go to a staffed shipping location.

FedEx Acct. No.

Total Packages   Total Weight   Total Declared Value†
1   ___ lbs.   $

†Our liability is limited to US$100 unless you declare a higher value. See back for details. By using this airbill you
agree to the service conditions on the back of this airbill and in the current FedEx Service Guide, including terms
that limit our liability.

Rev. Date 3/19 • Part #163134 • ©1994–2019 FedEx • PRINTED IN U.S.A.

611



Filed and Attested by the
Office of Judicial Records
27 JUL 2023 03:36 pm
S. GILLIAM

# EXHIBIT   B

Case ID: 230702187

July 26, 2023

Dear Customer,

The following is the proof-of-delivery for tracking number: 817387867731

---

**Delivery Information:**

| | | | |
|---|---|---|---|
| **Status:** | Delivered | **Delivered To:** | Receptionist/Front Desk |
| **Signed for by:** | J.STRICKLAND | **Delivery Location:** | |
| **Service type:** | FedEx Priority Overnight | | |
| **Special Handling:** | Deliver Weekday;<br>Direct Signature Required | | BALTIMORE, MD, |
| | | **Delivery date:** | Jul 25, 2023 08:47 |

**Shipping Information:**

| | | | |
|---|---|---|---|
| **Tracking number:** | 817387867731 | **Ship Date:** | Jul 24, 2023 |
| | | **Weight:** | 2.0 LB/0.91 KG |
| **Recipient:** | | **Shipper:** | |
| BALTIMORE, MD, US, | | PHILADELPHIA, PA, US, | |
| **Reference** | 69190 080 | | |

Signature image is available. In order to view image and detailed information, the shipper or payor account number of the shipment must be provided.

Thank you for choosing FedEx

Case ID: 230702187

*Filed and Attested by the Office of Judicial Records 08 AUG 2023 10:19 am S. GILLIAM*

| | | |
|---|---|---|
| **STOBBA ASSOCIATES, L.P.** | : | PHILADELPHIA COUNTY |
| | : | COURT OF COMMON PLEAS, PA |
| *Plaintiff,* | : | CIVIL ACTION |
| | : | |
| | : | CASE NO. <u>02187</u> |
| v. | : | |
| | : | JULY TERM, 2023 |
| **GIANT FOOD STORES, LLC** | : | |
| **n/k/a THE GIANT COMPANY LLC** | : | JURY TRIAL DEMANDED |
| and | : | |
| **AHOLD U.S.A., INC.** | : | COMMERCE PROGRAM |
| and | : | |
| **TODD ROBINSON** | : | |
| and | : | |
| **BRADLEY MARKLE** | : | |
| | : | |
| *Defendants.* | : | |

## <u>ACCEPTANCE OF SERVICE OF VERIFIED COMPLAINT</u>

I, Timothy G. Decker, hereby accept service of Plaintiff's Verified Complaint on behalf of

Todd Robinson in the above-captioned matter and certify that I am authorized to do so.

Respectfully submitted,

Dated: August 8, 2023     BY:    <u>/s/ Timothy G. Decker</u>
                        Timothy G. Decker (Pa. Bar No. 329378)
                        Hunton Andrews Kurth LLP
                        951 East Byrd Street
                        Riverfront Plaza, East Tower
                        Richmond, Virginia 23219
                        Phone: 804-788-7270
                        Email: tdecker@huntonak.com
                        *Attorney on behalf of Todd Robinson*

*Filed and Attested by the
Office of Judicial Records
08 AUG 2023 10:22 am
S. GILLIAM*

| | | |
|---|---|---|
| **STOBBA ASSOCIATES, L.P.** | : | PHILADELPHIA COUNTY |
| | : | COURT OF COMMON PLEAS, PA |
| *Plaintiff,* | : | CIVIL ACTION |
| | : | |
| | : | CASE NO. <u>02187</u> |
| v. | : | |
| | : | JULY TERM, 2023 |
| **GIANT FOOD STORES, LLC** | : | |
| **n/k/a THE GIANT COMPANY LLC** | : | JURY TRIAL DEMANDED |
| and | : | |
| **AHOLD U.S.A., INC.** | : | COMMERCE PROGRAM |
| and | : | |
| **TODD ROBINSON** | : | |
| and | : | |
| **BRADLEY MARKLE** | : | |
| | : | |
| *Defendants.* | : | |

## <u>ACCEPTANCE OF SERVICE OF VERIFIED COMPLAINT</u>

I, Timothy G. Decker, hereby accept service of Plaintiff's Verified Complaint on behalf of

Bradley Markle in the above-captioned matter and certify that I am authorized to do so.

Respectfully submitted,

Dated: August 8, 2023     BY:    <u>/s/ Timothy G. Decker</u>
                    Timothy G. Decker (Pa. Bar No. 329378)
                    Hunton Andrews Kurth LLP
                    951 East Byrd Street
                    Riverfront Plaza, East Tower
                    Richmond, Virginia 23219
                    Phone: 804-788-7270
                    Email: tdecker@huntonak.com
                    *Attorney on behalf of Todd Robinson*

Case ID: 230702187